Argued to Department No. 2, April 18, reversed and remanded May 28, rehearing allowed. Rearranged and submitted *in banc* July 16, reversed in part and affirmed in part October 22, further rehearing denied December 10, 1918.

# MALLOY v. MARSHALL-WELLS HARDWARE CO.*

(173 Pac. 267; 175 Pac. 659; 176 Pac. 589.)

**Appeal and Error — Record — Sufficiency — Removal of Cause—Evidence.**

1. The contention that the state court lost its jurisdiction on defendant's filing petition and bond for removal to the federal court, even if otherwise well taken, cannot be sustained, where the bill of exceptions shows no evidence of such filing, although the petition and bond alleged to have been filed were attached to answer as exhibits.

[As to appealability of order transferring cause from state to federal court, see note in Ann. Cas. 1916D, 1049.]

**Removal of Causes—Diverse Citizenship—Time of Filing Petition.**

2. Under Act Cong. Aug. 13, 1888, Chapter 866 (25 Stat. 435), providing that petition for removal of causes to federal court, based on diversity of citizenship, must be filed before the defendant is required by law or rule of the state court to answer, the time of filing petition expires on such date, notwithstanding the time to answer may have been extended by stipulation or court order.

**Master and Servant — Injuries to Servant — Negligence—Safety Devices—Evidence.**

3. In an action by a servant for personal injuries alleged to have been caused by the dangerous condition of the master's hatchway, evidence that a similar hatchway was provided with a cleat, *held* admissible to show that it was practicable to use such safety devices.

**Master and Servant — Injuries to Servant — Machinery—Safety Devices—Evidence.**

4. In an action by a servant for injuries sustained, alleged due to master's failure to safeguard a hatchway, evidence that after plaintiff's injury the master placed a railing around the hatchway was admissible to show that such a railing was practicable.

**Appeal and Error—Review—Bill of Exceptions—Sufficiency.**

5. A bill of exceptions setting out the instructions, with exceptions thereto, refused instructions, with exceptions allowed thereto, with exhibits not physically attached to the bill, but certified in trial judge's certificate to contain a complete transcript of the evidence, is sufficient for consideration of rulings on motions for nonsuit and directed verdict.

*On the question as to master's duty to guard machinery as a delegable one, see notes in 54 L. R. A. 71; 17 L. R. A. (N. S.) 568.

REPORTER.

**Master and Servant—Negligence — Dangerous Premises — Control of Leased Property—Evidence.**

6. Evidence *held* ample to entitle the jury to infer from tenant's enlargement of a hatchway and continued use thereof that it had such control thereof that it could inclose and otherwise safeguard the hatchway.

**Master and Servant—Injury to Servant—"Machinery."**

7. A block and tackle used for hoisting things through a hatchway constitutes "machinery," within the meaning of the Employers' Liability Act (Laws 1911, p. 16).

**Master and Servant—Dangerous Machinery—Duty—Use.**

8. Although the master is a merchant leasing and using a barn, in so far as it operates machinery therein it comes within Laws of 1911, page 16, requiring floor openings and similar dangerous places to be inclosed, notwithstanding they may be used only 10 or 12 times a year.

**Master and Servant — Injuries to Servant — Dangerous Premises — Hatchway.**

9. Evidence *held* to justify the jury in finding that it was practicable for the master to have installed a guard-railing around a hatchway in its barn; failure to do which caused injury to plaintiff.

**Master and Servant—Injuries—Care—Delegation of Duty.**

10. The master's duty under Laws of 1911, page 16, to construct a guard-rail around a hatchway to protect its servants is absolute and nondelegable, and would remain obligatory on the master, even if it had ordered its servant, plaintiff, to construct the guard-rail.

**Master and Servant—Injuries to Servant—Scope of Employment—Servant Working for Himself.**

11. A servant employed to work in and living in his master's barn, and injured while hoisting wood therein for his own use, was not a trespasser, and was justified in using facilities at hand; and where his injury was chargeable in part to the master's violation of law in leaving a hatchway without a safeguard, the master is liable.

**Master and Servant — Injuries to Servant — Actions — Liability of Foreman.**

12. Where a servant was injured on the master's premises while working for himself, and not under the direction of the master's foreman, the foreman would not be liable, under Laws of 1911, page 17, section 3, for failure to install safety devices as required.

**Master and Servant—Injuries to Servant—Actions—Manner of Doing Work.**

13. Those provisions of the Employers' Liability Act, defining the manner of doing certain work, are inapplicable to the case of a servant injured through the breaking of his master's rope while engaged in working for himself, and the master's foreman was not required to test the rope selected by plaintiff.

**Statutes—Construction—Legislative Intent.**

14. In the construction of a statute, the paramount duty of the court is to give effect to the legislative intent; and where a statute

is re-enacted with an additional clause or proviso, the clause must not be presumed meaningless.

**Exceptions, Bill of—Form—Constitution—Statute—Construction.**

15. Article VII, Section 3, of the Constitution, as amended (see Laws 1911, p. 7), provides that upon appeal either party may have attached to the bill of exceptions the whole testimony, instructions, and other material matter, and Laws of 1913, page 651, re-enacts Section 171, L. O. L., with the further proviso that the bill of exceptions may consist of a transcript of the whole testimony and proceedings of the trial, the instructions and any other matter material to the decision on appeal, etc., a bill of exceptions conforming to the proviso requires review of instructions.

**Trial—Instructions—Assuming on Trial—Evidence—Instructions.**

16. Instructions that assume facts not supported by the evidence are erroneous.

**Master and Servant—Injuries to Servant—Instructions—Inspection of Machinery.**

17. An instruction that the Employers' Liability Act applied to the manner of doing work, where the injured servant was working for himself with the master's machinery, and that master's foreman, who was not directing the work, was liable for failure to test a rope, was erroneous.

**Master and Servant—Injuries to Servant—Instructions—Diligence of Master.**

18. Instruction on the common-law liability of a master for injuries to a servant, caused from the unsafe condition of a hatchway, *held* erroneous, as exacting too high a degree of diligence.

**Trial—Instructions—Contradiction.**

19. Contradictory instructions are erroneous.

**Master and Servant—Injuries to Servant — Actions — Instructions— Contributory Negligence—Pleading.**

20. Allegations of master's answer that whatever injuries the servant suffered were the result of his own acts, and that any negligence involved was that of the servant, were sufficient to justify the court in instructing on contributory negligence.

### ON REHEARING.

**Judgment—Estoppel by Judgment—Involuntary Nonsuit.**

21. Where servant sued the master for injuries, involuntary nonsuit did not, in view of Section 184, L. O. L., bar subsequent action against both the master and the foreman.

**Appeal and Error—Scope—Conflicting Evidence.**

22. In servant's action for injuries, the court on appeal cannot disturb the jury's finding that plaintiff was an employee where there was some evidence of that relation.

**Master and Servant—Injuries to Servant—Course of Employment— Questions for Jury.**

23. Where servant set up master's contract to supply fuel wood, and alleged injuries while hoisting wood to his own quarters, whether

90 Or.—20

the foreman's ordering other servants to haul wood to plaintiff's place of work constituted a recognition of such alleged agreement, and whether the wood belonged to plaintiff and not to the master, *held* for the jury.

**Master and Servant — Employers' Liability Act—Construction—Liability of Foreman.**

24. The Employers' Liability Act extends liability to foremen, in view of Section 3 thereof, making the foreman criminally liable for neglect of duty.

**Statutes—Construction—Title.**

25. The title may be looked to for the purpose of ascertaining the meaning of the act.

**Statutes—Enactment—Initiative.**

26. An act adopted by the initiative must comply with Article IV, Section 20, of the Constitution, as to subjects and titles of acts.

**Master and Servant—Injuries to Servant—Actions—Defenses Available to Foreman.**

27. Under the Employers' Liability Act, though the foreman may be criminally liable for neglect of duty, the defense of contributory negligence is open to him in a civil action notwithstanding it is withdrawn from the employer.

**Master and Servant—Employers' Lability Act—Criminal and Civil Liability of Foreman.**

28. The Employers' Liability Act, Section 3, making the foreman criminally liable for neglect of duty, and providing that such punishment shall not affect his civil liability, neither enlarges nor lessens the foreman's civil liability.

### ON PETITION FOR FURTHER REHEARING.

**Appeal and Error—Supplemental Record—Finding After Decision.**

29. The court will not order a record to be supplemented to present omitted matters concerning an affirmative defense, shown in the petition for rehearing, where the questions arising thereunder have been twice decided adversely to defendant appellant.

**Removal of Causes—Denial of Second Motion After Remand.**

30. Where a cause was removed to federal court upon first petition therefor, asserting diversity of citizenship, and was remanded to the state court, the state court correctly denied a second petition, which was simply an enlarged edition of the first in deference to the order of the federal court.

From Multnomah: HARRY H. BELT, Judge.

Department 2.

This is an action to recover damages for a personal injury sustained by plaintiff September 11, 1915. It

appears that Marshall-Wells Hardware Company is operating a two-story barn at the corner of Seventeenth and Lovejoy Streets, in the City of Portland. Plaintiff had been in the employ of this corporation since April, 1910. For upwards of four years prior to his injury he had lived with his family in the barn above referred to. His duties were manifold; they included the care of the horses, the cleaning of the barn, looking after the harness and the vehicles and selling gasoline. Plaintiff had no hours of work, but was on duty practically all the time. He was liable to be awakened at night and called on to look out for a sick horse. Plaintiff reported to the defendant Camp, who was superintendent of the Portland business of his co-defendant. Plaintiff was not a foreman and no employee of the corporation looked to him for instructions.

The accident occurred about 5 o'clock on Saturday afternoon. Plaintiff was engaged in hoisting wood from the first floor of the barn to the second story through a hatch or opening in the second floor six feet by four. The defendant had constructed a track for a hay-carrier ten feet above the second floor of the barn and at the time of the accident a pulley was fastened to this track. One end of the rope passing around this pulley ran to another pulley which was anchored by a short rope to a piece of lumber nailed across one of the stalls. A horse was hitched to the end of the rope passing through this second pulley. The other end of the rope was tied to a sling passing around a box of wood. The horse was driven by William Malloy, one of plaintiff's sons. Plaintiff and J. W. Miller were at the hatchway on the second floor to receive the wood as it was elevated. As the box of wood reached the second floor it caught. Plaintiff and Miller reached out

with poles to guide the box through the hatch. At this time the anchor rope attached to the pulley on the ground floor broke and plaintiff fell through the hatch, sustaining serious injuries.

There is evidence that to the east of the hatch the second floor was slippery because hay had been repeatedly pulled across it. Negligence is predicated on this circumstance; also on the fact that the hatch was too small to admit of the easy passage through it of hay and other things which were hoisted to the second floor. The action is based in part also on the admitted fact that the hatch was unguarded by a railing of any kind. It appears that when not in use the hatch was closed by two hinged doors and that when the hatch was open these doors rested on the floor. Plaintiff also charges negligence in the failure of defendants to test the rope which broke.

The defendants deny all allegations of negligence and allege that plaintiff's injuries are due wholly to his own acts while working for himself in matters apart from the work for which he was employed by the defendant corporation.

Judgment was entered on a verdict for plaintiff against both defendants and the defendants appeal.

REVERSED WITH DIRECTIONS.

For appellants there was a brief over the names of *Messrs. Emmons & Webster* and *Messrs. Stapleton, Conley & Stapleton,* with oral arguments by *Mr. Lionel R. Webster* and *Mr. J. L. Conley.*

For respondent there was a brief over the names of *Messrs. Wilbur, Spencer & Beckett, Messrs. Bauer & Greene, Mr. A. H. McCurtain* and *Mr. J. W. Kaste,* with oral arguments by *Mr. S. C. Spencer* and *Mr. Kaste.*

McCAMANT, J.—1. A preliminary question is suggested by the contention of Marshall-Wells Hardware Company that the state court lost jurisdiction on the filing of its petition and bond on removal to the federal court. It is alleged in the first affirmative answer of this defendant that such petition and bond were filed in the Circuit Court February 16, 1917, and that the Circuit Court refused to make an order removing the cause.

The petition and bond alleged to have been filed are attached to the answer as exhibits. The reply admits:

"That after the time allowed by law for the removal of this cause to the District Court of the United States for the District of Oregon, said defendant attempted to remove the same but was unsuccessful."

The other allegations of the answer are denied. The bill of exceptions fails to show any evidence on this subject. Nothing further is shown in this connection by any part of the record. It does not appear, therefore, that the petition and bond were filed in the Circuit Court. This condition of the record prevents us from sustaining this contention of Marshall-Wells Hardware Company even if it were otherwise well taken.

2. The petition attached to the answer as an exhibit is sworn to under date of February 14, 1917, and could not have been filed earlier than that date. It alleges that the petitioning defendant was duly served within Multnomah County, December 14, 1916. When, as in this case, the right of removal is based on diversity of citizenship, the petitioner is required to file his petition "at the time, or any time before the defendant is required by the laws of the state or the rule of the

state court in which such suit is brought to answer or plead to the declaration or complaint of the plaintiff'': 25 Stat. 435.    Under our law the petitioning defendant was required to answer or plead to the complaint by December 24, 1916, and although his time so to plead may have been enlarged by stipulation or court order, his time to petition for removal expired on that day.    There is a line of authority to the effect that a plaintiff who stipulates for an extension of time within which to answer will not be heard to contend that the time allowed for the removal of the cause has expired. If this principle can be considered settled, it by no means follows that the Circuit Court lost jurisdiction of this cause by the filing of a petition and bond on removal February 14, 1917.    The Circuit Court did not err in retaining jurisdiction of the cause.

3. Frank A. Doney, a witness for plaintiff, testified that the floor at the side of the hatch was slippery and that its dangerous condition could have been obviated if a cleat had been put around the edge thereof.    He was then asked, ''Have you ever seen barns where they have this cleat that way?''    Over the objection and exception of defendants he testified that he was familiar with a barn at Folsom, Montana, where such a cleat was in use about a floor opening.    This evidence was offered to show that it was practicable to use the devices whose absence was contended by plaintiff to constitute negligence.    In our opinion it was pertinent to the issue.

4. The witnesses Philip Erickson and William Malloy were permitted to testify over defendants' objection and exception that after plaintiff's injury a railing was put around the hatchway.    The court stated that this testimony had no tendency to establish negligence, but that it was admitted solely for the purpose of show-

ing that such a railing was practicable.   That the testimony when so limited was properly admitted is taught by *Love* v. *Chambers Lumber Co.,* 64 Or. 129, 134, 135 (129 Pac. 492).

5. Plaintiff contends that the bill of exceptions does not permit us to notice the other assignments of error which are pressed upon our attention.   The bill of exceptions recites the trial of the cause before a jury, the taking of plaintiff's testimony which is attached as Exhibit "A," the separate motions for nonsuit which were denied and the taking of defendants' testimony which is attached as Exhibit "B."   The only portion of the testimony which is segregated is that which illustrates the foregoing rulings on the admissibility of evidence.   The bill of exceptions sets out *seriatim* the instructions of the court, the exceptions reserved thereto and the requested instructions which were not given, defendants being allowed exceptions to the refusal thereof.   The exhibits which are sent up with the transcript are not physically attached to the bill of exceptions.   Plaintiff contends in reliance on *Keady* v. *United Railways Co.,* 57 Or. 325, 333, 334 (100 Pac. 658, 108 Pac. 197), that we cannot consider the bill of exceptions even for the purpose of reviewing the rulings on defendants' motions for a nonsuit and for a directed verdict.

In the case cited the exhibits consisted of considerable documentary evidence and the nature of the controversy was such that these documents might well prove decisive.   The documents were neither attached to the bill of exceptions nor identified in any way except by a certificate of the county clerk.   The certificate of the trial judge was to the effect that the bound volume of testimony together with the exhibits attached constituted all the evidence.   There being no

exhibits attached, it appeared affirmatively that a part of the testimony was missing. The court therefore applied the presumption that there was no error and refused to consider the questions based on the bill of exceptions. One of these questions was the alleged error in denying the motion for a nonsuit.

In the case at bar the certificate of the trial judge recites that Exhibits "A" and "B" "contain a full, true, complete and correct transcript of all the evidence." There is no mention of exhibits in the certificate. The exhibits referred to in the transcript of the evidence are few in number and unimportant in their bearing on the question of liability. Two of them are radiographs of plaintiff's spine; their evidentiary value relates wholly to the *quantum* of damages, a matter with which we are not concerned on this appeal. Another exhibit is a certified copy of an order of the federal court and no question is made but that its legal effect was correctly stated to the jury. Other exhibits are plats of the first and second floors of the barn where the accident occurred; they are illustrative of the testimony, but not otherwise material. The only remaining exhibit is a notice which was hanging in the barn and which advised teamsters what to do if they ran over anyone. The purport of all these exhibits is shown by the transcript of testimony which is duly identified. We are not disposed to extend the doctrine of *Keady* v. *United Railways Company* as we would have to do if we were to sustain this contention of plaintiff. It is our duty on this record to review the rulings of the Circuit Court in denying the separate motions for nonsuit and directed verdict interposed by defendants. We will first consider the motion interposed by the defendant corporation.

6. It appears by the testimony that when this defendant took possession of the barn in the autumn of 1910 it rigged up a hay carrier for the purpose of putting hay and other things in the second story of the barn. The hay carrier proved unsatisfactory and after the winter of 1911–1912 it was discarded. Thereafter hoisting was done by block and tackle substantially as at the time of the accident. The heavier articles were hoisted from outside the barn directly into the second story, but ten or twelve times a year the hatch through which plaintiff fell was used for hoisting purposes by employees of the defendant corporation. Sometimes they secured their power from an auto truck and sometimes they used a horse. They always used the pulley hung over the hatch and the other pulley anchored on the first floor. It is admitted that the defendant corporation was a lessee of the barn and there is ample evidence that it exercised control thereover. Prior to the date of plaintiff's injury the defendant corporation enlarged the hatchway. The jury was entitled to infer from this circumstance that this lessee had such control over the property as enabled it to inclose the hatchway and otherwise protect it.

7. We must hold that the block and tackle used for hoisting through the hatch constituted machinery. In *Dunn* v. *Orchard Land Co.*, 68 Or. 97, 102 (136 Pac. 872), Mr. Justice BURNETT adopts from the Encyclopedic Dictionary the following definition of machinery:

"A contrivance by means of which a moving power is made to act upon any body and communicate motion to it."

In *Corning* v. *Burden*, 15 How. (U. S.) 252, 267 (14 L. Ed. 683), Mr. Justice GRIER says:

"The term 'machine' includes every mechanical device or combination of mechanical powers and de-

vices to perform some function and produce a certain effect or result.''

Other judicial definitions are collated in 5 Words and Phrases, 4267, and 3 Words and Phrases, Second Series, 204. Under all of the definitions the device and arrangement used for hoisting into the second story of the barn are machinery.

8, 9. The Employers' Liability Law of 1910 is applicable to all ''persons whatsoever, engaged in the * * operation of any machinery'': Laws 1911, p. 16. While the defendant corporation is primarily a merchant and while the structure in question is a barn, in so far as the defendant operates machinery therein it comes within the purview of the act above referred to and is chargeable with the duties therein defined. One of the duties prescribed by the first section of this act is:

''All shafts, wells, floor openings and similar places of danger shall be inclosed.''

It is true that the defendant corporation engaged in the operation of machinery at the hatch only ten or twelve times a year. It is also true that ordinarily the hatch was closed with trap-doors. These circumstances do not relieve this defendant from the duty imposed by the statute. The applicability of the statute is not dependent upon the continuity of the operation of the machinery. The testimony shows that the hatch was opened frequently for the purpose of throwing down hay and packing material. The hatch was unquestionably a floor opening and the statute required it to be inclosed. The evidence showed that the track to which the pulley was attached was ten feet above the floor of the second story of the barn. A guard-rail four or five feet in height could therefore have been constructed about the hatch without destroy-

ing its usefulness for hoisting purposes. The evidence justified the jury in finding that such a rail was practicable and that if it had been installed plaintiff would not have been injured.

10. It is contended that plaintiff himself should have constructed the guard-rail. There is evidence that he could have secured from the defendant corporation the materials required for such construction, but there is no evidence that it was his duty so to do. Under the statute this duty devolved on Marshall-Wells Hardware Company. This duty was absolute and nondelegable. It would still have been obligatory on the corporation even if plaintiff had been ordered to construct the guard-rail and had agreed to do so: *Bowersock* v. *Smith,* 243 U. S. 29 (61 L. Ed. 572, 37 Sup. Ct. 371). As illustrative of the construction given statutes of this class see *Steel and Masonry Contracting Co.* v. *Reilly,* 210 Fed. 437, 439 (127 C. C. A. 169); *Ford Motor Co.* v. *Donaldson,* 218 Fed. 350, 351, 352 (134 C. C. A. 158); *Continental Public Works Co.* v. *Stein,* 232 Fed. 559, 563 (146 C. C. A. 517); *Feldman* v. *Robert E. Mackay Co.,* 174 N. Y. App. Div. 848 (161 N. Y. Supp. 564).

11. For the determination of the question now under consideration it is not decisive that plaintiff was working for himself at the time of his injury. He was not a trespasser, but was where he had a right to be. He was certainly authorized to use the wood and in order that he might use it he had to hoist it. He was justified in using the facilities which were at hand for such purpose. While so engaged in a lawful occupation he was injured and there was evidence that the injury was chargeable in part to the violation by the defendant Marshall-Wells Hardware Company of a plain duty imposed upon it by statute. The Circuit Court

did not err in denying the motions of this defendant for a nonsuit and a directed verdict.

12. A different question was raised by the motions of like purport presented on behalf of the defendant Camp. His liability, if it exists, must be predicated on Section 3 of the Employers' Liability Law, Laws 1911, page 17. This section provides:

"It shall be the duty of owners, contractors, sub-contractors, foremen, architects or other persons having charge of the particular work, to see that the requirements of this act are complied with, and for any failure in this respect the person or persons delinquent shall, upon conviction of violating any of the provisions of this act, be fined not less than ten dollars, nor more than one thousand dollars, or imprisoned not less than ten days, nor more than one year, or both, in the discretion of the court, and this shall not affect or lessen the civil liability of such persons as the case may be."

It will be noted that there is an error in this section as printed in the General Laws of Oregon for 1911. The enrolled act on file with the Secretary of State reads as above.

The defendant Camp was not in charge of the work which plaintiff was doing at the time of his injury. The wood which was being hoisted was part of a large quantity on the ground floor of the barn and which was in the way. Plaintiff testifies that Camp said to him about a week before the accident: "Well, it should be taken out of here, it is in the road." This was not an order to plaintiff to take the wood upstairs and no witness testifies to such an order. We find no evidence that in taking the wood upstairs plaintiff was working for anyone other than himself. It is true that the teamsters had a stove on the ground floor of the barn and that they occasionally went upstairs for wood

when the supply downstairs was exhausted. It is clear nevertheless that the wood was being hoisted for plaintiff's use. It was not being taken upstairs that it might later be brought downstairs. There was evidence from which the jury was entitled to infer that the defendant corporation had agreed to supply plaintiff with some fire-wood, but there was no evidence that said defendant was obligated to deliver the wood on the second floor of the barn.

13. The defendant Camp was under no obligation to test the rope which broke. The rope was one selected by plaintiff himself from a quantity of ropes belonging to the defendant corporation. The work in the course of which plaintiff was injured was not the work of the defendants and those provisions of the Employers' Liability Act defining the manner in which certain work shall be done were inapplicable to this case.

In *Hoag* v. *Washington-Oregon Corporation,* 75 Or. 588, 604 (144 Pac. 574, 147 Pac. 756), liability was predicated on misfeasance rather than nonfeasance and the individual defendants held liable were in actual charge of the work which caused the injury. In *Lawton* v. *Morgan,* 66 Or. 292 (131 Pac. 314, 134 Pac. 1037), and *Tamm* v. *Sauset,* 67 Or. 292, 297 (135 Pac. 868), the responsibility imposed by the Employers' Liability Act is limited to the classes of persons named therein. We think the defendant Camp is not one of the persons so named and that he cannot be held liable under this statute. The record also fails to charge him with a common-law liability. If anyone was liable because of the slippery condition of the floor by the side of the hatch, it was the corporation and not its superintendent.

The motion for a nonsuit presented by this defendant should have been allowed.

14, 15. The remaining assignments of error are based on the instructions given by the Circuit Court and the requests to instruct which were refused. Plaintiff invokes the doctrine of *Eaton* v. *Oregon Ry. & N. Co.,* 22 Or. 497, 503 (30 Pac. 311); *Keady* v. *United Railways Co.,* 57 Or. 325, 332 (100 Pac. 658, 108 Pac. 197); *National Council* v. *McGinn,* 70 Or. 457, 463 (138 Pac. 493); *Oliver* v. *Grande Ronde Grain Co.,* 72 Or. 46, 49, 50 (142 Pac. 541); *Smith* v. *Kinney,* 72 Or. 514, 517 (143 Pac. 901, 1126); *Harrison* v. *Pacific Ry. & Nav. Co.,* 72 Or. 553, 557, 558 (144 Pac. 91); *Cathcart* v. *Oregon-Wash. R. & N. Co.,* 86 Or. 250, 253, 254 (168 Pac. 308). In reliance on these authorities it is argued that none of the questions raised by the exceptions to instructions given and refused can be considered.

When the first two of the above cases were decided, our statute defining the form of bills of exceptions was as follows:

"No particular form of exception shall be required. The objection shall be stated with so much of the evidence or other matter as is necessary to explain it, but no more": Section 171, L. O. L.

In 1913 this statute was amended so as to read:

"No particular form of exceptions shall be required. The objection shall be stated, with as much evidence, or other matter, as is necessary to explain it, but no more; *provided, however,* that the bill of exceptions may consist of a transcript of the whole testimony and all of the proceedings had at the trial, including the exhibits offered and received or rejected, the instructions of the court to the jury, and any other matter material to the decision of the appeal": Laws 1913, p. 651.

The last five of the cases cited by plaintiff were decided subsequent to the amendment, but they do not discuss it. All of the cases cited by plaintiff announce

the rule that when the bill of exceptions consists merely of a transcript of the proceedings had at the trial, it will be considered only for the purpose of reviewing the rulings of the trial court on motions for nonsuit and directed verdict.  It was held in *National Council* v. *McGinn*, 70 Or. 457, 463 (138 Pac. 493), that the form of the bill of exceptions was not involved in the *mandamus* proceeding there litigated and what was there said on the subject was merely advisory of the views of the learned author of the opinion.  Notwithstanding what was said as to the form of the bill of exceptions in *Oliver* v. *Grande Ronde Grain Co.*, 72 Or. 46 (142 Pac. 541), the court reviewed the action of the lower court in instructing the jury and considered one instruction in the light of the evidence.  In *Smith* v. *Kinney*, 72 Or. 514 (143 Pac. 901, 1126), it was held that the trial court erred in directing a verdict and what was said as to the form of the bill of exceptions was not necessary to the conclusion reached.  In *Harrison* v. *Pacific Ry. & Nav. Co.*, 72 Or. 553, 558, 559 (144 Pac. 91), notwithstanding the criticisms passed on the bill of exceptions the court decided the legal questions raised by the appeal in so far as they involved the correctness of the instructions.  In *Cathcart* v. *Oregon-Wash. R. & N. Co.*, 86 Or. 250 (168 Pac. 308), defendants' motion for a nonsuit was sustained and what was there said as to the form of the bill of exceptions was not necessary to the conclusion reached.

In *Hoag* v. *Washington-Oregon Corporation,* 75 Or. 588, 602 (144 Pac. 574, 147 Pac. 756), notwithstanding the criticism passed on the form of the bill of exceptions the court reviewed the instructions in the light of the evidence.  It was held in that case that the litigation was controlled by the Employers' Liability Law of 1910, a conclusion which could not have been reached

without consideration of the evidence. The bill of exceptions in that case is not to be distinguished from the bill of exceptions in this case.

Notwithstanding some sweeping language found in the opinions cited by plaintiff, this court has repeatedly passed on the accuracy of instructions when the latter have been presented by bills of exceptions in substantially the form of the bill in this case.

A re-examination of the statute as amended in 1913 convinces us that this appellant is entitled to a decision of the questions presented on its exceptions to the instructions given and refused by the trial court. In the construction of a statute the paramount duty of the court is to give effect to the legislative intent: *State* v. *Simon,* 20 Or. 365, 370 (26 Pac. 170); *Duncan* v. *Dryer,* 71 Or. 548, 557 (143 Pac. 644); Endlich on the Interpretation of Statutes, § 295. It is not to be presumed that the legislature did a vain thing when it amended Section 171, L. O. L. An interpretation of the amended statute which leaves the law after the amendment in the same condition as before is presumptively unsound. Yet this is the effect of a construction of the statute which denies the force and effect of a bill of exceptions to a transcript prepared in accordance with its directions.

In 1910 Article VII of the Constitution was amended so as to provide among other things that "upon appeal of any case to the Supreme Court, either party may have attached to the bill of exceptions the whole testimony, the instructions of the court to the jury, and any other matter material to the decision of the appeal": Laws 1911, p. 7. After the adoption of this amendment litigants in many cases took advantage of it and in 1913 the legislature amended the statute defining the form of a bill of exceptions. The amendment re-

enacted the old statute and added the proviso. Effect should be given to each portion of the amended act; none of it should be rejected as surplusage: *Henry* v. *Yamhill County*, 37 Or. 562, 564 (62 Pac. 375).

The old statute re-enacted the general rule applicable to the form of a bill of exceptions; the proviso added by the amendment made an exception to the general rule. It provided "that the bill of exceptions may consist of a transcript of the whole testimony and all of the proceedings at the trial, including the exhibits offered and received or rejected, the instructions of the court to the jury, and any other matter material to the decision of the appeal." The use by the legislature of the language of the constitutional amendment is significant. Under the Constitution as amended the parties were entitled to attach to the bill of exceptions a transcript of the proceedings had at the trial. The legislature provides that the bill of exceptions may consist of this transcript.

In Endlich on the Interpretation of Statutes, Section 216, it is said:

"Where there are, in an act, specific provisions relating to a particular subject, they must govern, in respect of that subject, as against general provisions in other parts of the statute, although the latter, standing alone, would be broad enough to include the subject to which the more particular provisions relate."

It is contrary to the canons of construction to interpret the old statute re-enacted in such manner as to eliminate the effect of the proviso. A fair and natural interpretation of the language used in the act of 1913 permits the trial court at its option to settle the bill of exceptions in the form required by *Eaton* v. *Oregon Ry. & N. Co.*, 22 Or. 497, 503 (30 Pac. 311), and *Keady* v.

*United Railways Co.,* 57 Or. 325, 332, 333 (100 Pac. 658, 108 Pac. 197), or to certify a bill of exceptions in the form of a transcript of the proceedings at the trial. To give an effect to the bill settled in one form which is denied to it if settled in the other form is to legislate judicially. In *Redsecker* v. *Wade,* 69 Or. 153, 156, 157 (134 Pac. 5, 138 Pac. 485, Ann. Cas. 1916A, 269), it is said:

"The object of the law and the purpose of the bill of exceptions is to provide for this court a succinct and intelligible statement of the errors about which complaint is made on the appeal. In some cases this can be accomplished by a very brief statement. In others it may be necessary to send to this court everything mentioned in the proviso."

The effort of counsel for appellant should be to prepare and present a bill of exceptions which will raise the questions relied on with a minimum of verbiage, but we cannot refuse to consider any bill which conforms to the statutory requirements. We have examined the evidence for the purpose of reviewing the rulings of the trial court on the motions for a nonsuit and a directed verdict. It is easier to pass upon the instructions in the light of this evidence than it is to forget the evidence and pass upon the charge of the court solely in its relation to the pleadings, as was done in *Portland Public Market* v. *Woodworth,* 67 Or. 327, 331 (135 Pac. 529). A refusal to review these instructions would be to affirm a large judgment when the record clearly shows that the defendant which must pay the judgment has not had a fair trial. On an examination of this bill of exceptions it is apparent that the instructions on which the verdict was based are contradictory and unsound, and that the questions determined by the verdict are not the real questions presented by the record.

This bill of exceptions conforms to the proviso in the act of 1913 and it is our duty to pass on the questions which it raises. All bills of exceptions which come before the court in the future in either of the forms prescribed by that act will be regarded as sufficient.

16. The court gave the following instruction:

"The next question which you should determine, aside from the question of negligence, is this: Was plaintiff at the time of his alleged injury working for himself or was he working for the company? If you believe that he was working for himself and was not carrying on the business of the company or promoting its interests, then you must necessarily find for the defendants.

"An employee, in obeying or carrying out the orders of his superior, or one whose orders he is bound to obey, is within the scope of his employment in so doing, and is performing his duties to his employer in carrying out such orders. Now if you find from a preponderance of the evidence in the case that the defendant Camp ordered or directed or told plaintiff to move the wood from where it was placed, that it was in the way; and that plaintiff in obedience to said order or command did attempt to move said wood, then in so doing he was performing duties to his employer, and such work was within the scope of his employment. However, if at the time of the alleged injuries the plaintiff was taking the wood in question up the hoist way for his own use and benefit, and was not acting under the orders of the defendants, then the court says to you as a matter of law, that he cannot recover."

This instruction is without support in the evidence and is for that reason erroneous: *Bailey* v. *Davis,* 19 Or. 217, 222 (23 Pac. 881); *Bowen* v. *Clarke,* 22 Or. 566, 568 (30 Pac. 430, 29 Am. St. Rep. 625). The direction of Camp to take the wood out of the way was not an order to hoist it upstairs, nor was there any evi-

dence that plaintiff was performing the work of Marshall-Wells Hardware Company when he was engaged in such hoisting. Plaintiff testified that the defendant corporation had agreed to furnish him free wood. Under the testimony of both parties he was entitled to take wood from the pile on the ground floor of the barn. When he segregated the wood he desired and placed it in boxes for hoisting, it became his wood and in hoisting it he was working for himself.

For the same reason the court erred in giving the following instruction:

"If you believe from the evidence that the defendant, Marshall-Wells Hardware Company had agreed to furnish the plaintiff wood, either as a part of his compensation for working for it or otherwise, you must then determine from the evidence whether or not such agreement so to furnish such wood required said defendant to deliver such wood upstairs to the plaintiff's living apartments or whether or not such agreement would be fully complied with by the delivery of such wood downstairs in the building in which the plaintiff's living apartments were located. And if you believe from the evidence that the defendant, Marshall-Wells Hardware Company, did agree to furnish the plaintiff wood for use in the apartments where he lived and if the delivery of such wood on the lower floor of the building in which the plaintiff's living apartments were located was a full compliance with such agreement, and if you further believe that the plaintiff received the injury for which this action is brought while engaged in removing such wood from the lower floor of such building to his living apartments above and was not acting pursuant to the orders of the defendants, you must find for the defendants."

There is no evidence that plaintiff's employer agreed to deliver wood to the second story of the barn for his use.

17. The court also gave the following instruction:

"The Employers' Liability Act provides among other things that all owners, corporations, or persons whatsoever engaged in the operation of any machinery shall see that all·rope used therein is carefully selected and inspected and tested so as to detect any defects therein, and that all shafts, wells, floor openings and similar places of danger shall be inclosed, and generally that all owners, contractors, or subcontractors and other persons having charge of any or responsible for any work involving a risk or danger to the employees or to the public, shall use every device, care and precaution which it is practical to use for the protection and safety of life and limb, limited only by the necessity for preserving the efficiency of the structure, machine or other apparatus or device and without regard to the additional cost of suitable material or safety appliances or devices.

"This Employers' Liability Act further provides that the manager, superintendent, foreman or other person in charge or control of the work or a portion or any part thereof shall be held to be the agent of the employer in all suits for damages for death or for injury suffered by an employee.

"I instruct you as a matter of law that these ropes and these pulleys and this apparatus that the plaintiff and his fellow-employees were using at the time plaintiff claims he was injured is and was machinery and such machinery as referred to in said Employers' Liability Act, and that this cause of action is governed by the provisions of said act."

In so far as the above instruction directed the attention of the jury to the statutory duty of Marshall-Wells Hardware Company to inclose the floor opening through which plaintiff fell, the instruction was pertinent to the pleadings and the testimony. But the work which plaintiff was doing was his own work; in the performance of that work he was not an employee of the Marshall-Wells Hardware Company. The Employers' Liability Act was therefore inapplicable to the

manner in which the work was done. The instruction misled the jury as to the duty devolving on the corporate defendant. The rope referred to in the instruction was one which plaintiff himself selected and threw to his son to be used by the latter. There is no evidence that his employer even knew of the work intended to be done. The corporate defendant was under no obligation to test this rope with a view to its sufficiency for hoisting wood to be used by plaintiff for his own purposes. The court erred in refusing the following instruction:

"I instruct you that neither of the defendants was required to test or inspect the rope which was used by the plaintiff as an anchor rope at the time of the accident."

18, 19. The court also erred in giving the following instruction:

"The court further instructs you that the Employers' Liability Act of this state further provides that all owners, contractors, or subcontractors, and other persons having charge of or responsible for any work involving a risk or danger to the employees or the public shall use every device, care and precaution, which it is practical to use for the protection and safety of life and limb, limited only by the necessity for preserving the efficiency of the structure, machine or other apparatus or device, and without regard to the additional cost of the suitable material or safety appliance and device.

"It is for you to determine from a preponderance of the evidence in this case, and from all the facts and circumstances, whether or not the work in which plaintiff was engaged at the time of his injury, if you find that he was injured, involved a risk or danger to himself, and if you determine from a preponderance of the evidence that said work did involve a risk or danger to plaintiff, then I charge you as a matter of law that it

was the duty of the defendants to have used every care and precaution, and every device which it was practicable to use for the protection of the plaintiff in said work, limited only by the necessity for preserving the efficiency of said hoistway, and the apparatus and appliance and machinery used in said work, and without regard to the additional cost of suitable (material) or safety appliance and device.   Hence, if you find from a preponderance of the evidence that said work did involve a risk or danger to plaintiff, and you further find from a preponderance of the evidence that the floor adjacent to said floor opening was slippery and that plaintiff in the performance of his work was obliged to stand upon said slippery floor, next to or close to said floor opening, and that by reason thereof his work involved a risk or danger to his life and limb, then I instruct you that it was the duty of the defendants to have prevented that risk or danger to plaintiff in his work by using every care and precaution and by using or installing every device which it was practicable for it to use or install, limited only by the necessity for preserving the efficiency of said hoistway and the apparatus used therein.''

A common-law liability might be predicated against the corporate defendant on the alleged unsafe condition of the floor adjacent to the hatchway, but it was not liable to the high degree of diligence exacted by the instruction, for the reason that the work in hand was not its work.

The last two instructions quoted are in contradiction of the following instruction given by the court:

''If the work in which plaintiff was engaged at the time of the injury for which he brings this action was not being done for the defendants, or either of them, then you must find for the defendants.''

It is error to give contradictory instructions: *Morrison* v. *McAtee*, 23 Or. 530, 534  (32 Pac. 400); *Neis* v.

*Whitaker,* 47 Or. 517, 524 (84 Pac. 699); *Wike* v. *Oregon-Washington R. & N. Co.,* 83 Or. 678, 685 (163 Pac. 825).

20. The court instructed the jury on the subject of contributory negligence and it is contended that this instruction was irrelevant to the issues. It is alleged in the first further and separate answer of the defendant corporation that "whatever accident happened to the plaintiff and whatever injury he suffered was the result of his own acts and of nothing else and if there was any element of negligence involved in the accident or injury, it was not the negligence of this defendant." This allegation was sufficient to justify the instruction complained of: *Tabor* v. *Coin Machine Mfg. Co.,* 85 Or. 194, 198 (166 Pac. 529).

The instructions were faulty in other respects than those above noted, but the error is not likely to be repeated on a retrial and we will not therefore prolong this opinion by noticing the remainder of the charge.

The judgment is reversed and the cause is remanded, with directions to enter a judgment of nonsuit as to the defendant Camp, and for further proceedings not inconsistent herewith as to the defendant Marshall-Wells Hardware Company.

REVERSED WITH DIRECTIONS.

McBRIDE, C. J., and MOORE, J., concur.

MR. JUSTICE BEAN dissents except as to that part of the opinion relating to the bill of exceptions.

Argued on rehearing July 16, reversed in part and affirmed in part October 22, 1918.

## ON REHEARING.

### (175 Pac. 659.)

In Banc.

The defendants Marshall-Wells Hardware Company and R. A. Camp appealed from a judgment awarded to Thomas Malloy, the plaintiff, for personal injuries. On September 11, 1915, Malloy was standing at the edge of a hatch cut in the second floor of a barn, which was maintained by the company, for the purpose of receiving a box of wood which was being hoisted from the first floor by means of pulleys, a rope and a horse, and as the box reached the second floor and just as Malloy took hold of the box to pull it clear of the opening a sling rope which was used to anchor the snatch block on the first floor broke, causing the box and the plaintiff to fall through the hatch and to the first floor. The appeal was first presented to and decided by a single department of this court: *Malloy* v. *Marshall-Wells Hardware Co.*, 173 Pac. 267. A petition for a rehearing was granted and the appeal was argued and submitted to the court sitting *in banc*.

The Marshall-Wells Hardware Company is a corporation engaged in the wholesale hardware business. The company owns a large warehouse in Portland, and it also maintains a barn at 17th and Lovejoy Streets. J. E. Harvey occupied the position of shipping clerk and as such had charge of the shipping department; and he not only had charge of the teamsters when "outside of the barn," but he also had authority to hire and discharge teamsters. For about ten years R. A. Camp acted as superintendent for the cor-

poration and had "direct charge of the office affairs and general charge of the warehouse, the machine shop and stables." In April or May of 1910, Camp employed Thomas Malloy to work for the company. Malloy began work by helping in the stockroom and after "a month or so" and at the direction of Camp "he was put on as a teamster." In October, 1910, Camp assigned Malloy to the position of barn boss at the company's stables located at 13th and Johnson Streets and referred to in the record as the old barn. After Malloy had been at the old barn about a week, he was directed by Camp to go to the new barn which had just been constructed at 17th and Lovejoy Streets and to take charge of it. The barn at 17th and Lovejoy Streets is a two-story building. Stalls for horses are built along the west or 17th Street side of the first floor and along the east side of this floor are located a dining-room, washroom, oilroom and a room which most of the witnesses called the "auto shed." The dining-room and washroom were maintained for the use of teamsters working for the company. On the second floor and on the Lovejoy Street side of the building are apartments, consisting of two bedrooms, a living-room, kitchen, pantry and a bathroom. The remainder of the second floor or "loft" is used for storing hay and grain for the horses, hay and excelsior used for packing, and other materials. There is a hatch in the second floor. The witnesses described this opening as being about four feet one way and six feet the other way. A plat received in evidence shows the dimensions to be six feet one and one half inches by four feet eight inches. The floor next to the east side of the hatch had become smooth and slippery by reason of the fact that most of the hay hoisted through the hatch had been taken to the east side of the barn,

and the same hay when dropped through the hole to the first floor was first shoved over the east side of the opening. There was a considerable quantity of wood, consisting of scraps and the ends of boards and the like, in or next to the auto shed. The company has a number of boxes on wheels, sometimes called dirt-trucks, which are used in the barn for various purposes. These boxes are three or four feet long, two or three feet wide and about two feet deep. On the day of the accident the plaintiff and W. J. Miller, a teamster in the employ of the company, filled two or three of these boxes with wood and pushed them over to a place underneath the hatch so that they could be hoisted by means of a rope and pulleys through the hatch and onto the second floor. A rope ran through and hung from a pulley fastened to a hay carrier track above the hatch. William Malloy, a son of the plaintiff, nailed a 2x6 board across the end of one of the stalls, looped a sling-rope around this board, fastened a snatch-block to the sling-rope and through the snatch-block ran one end of the rope which hung from the pulley above the hatch and then hitched a horse to that end of the rope. The other end of the rope was fastened to one of the boxes, containing wood, so that it could be hoisted to the second floor. The plaintiff and Miller ascended the stairway to the second floor to receive the box at the edge of the hatch. William Malloy drove the horse. During the process of raising the box, to use the language of the plaintiff, it "came kind of crooked through the hole, one corner of it, the corner of it caught in the joist and just stuck." By means of a stick the plaintiff "got the box loose and it came up over the floor, and I grabbed hold of it to pull it in and give it a jerk to pull it in on the floor. And at the same time the box jerked

me and it went down through the hole and brought me with it.'' Miller, who was at the hatch at the time of the accident, testified that the floor ''was slippery there and he (Malloy) couldn't hold himself with the rope, and he went with it.''

The complaint alleges that the defendant Camp as superintendent of the corporation had charge and control of the barn and the work to be done there; and that Camp ordered the plaintiff to remove the wood and that the latter was hurt while attempting to comply with such order. The complaint is framed upon the theory that Malloy was working for the corporation and executing an order of Camp when injured; and that the circumstances bring the plaintiff within the protection of the Employers' Liability Act, and that therefore both the Marshall-Wells Hardware Company as the employer and R. A. Camp, as the alleged foreman or person in charge of the work, are liable in damages for the injuries sustained by the plaintiff. The plaintiff charges that the defendants were negligent because they: (1) failed to maintain a guard-rail around the shaft; (2) failed to provide a system of communication by means of signals; (3) failed to provide a sufficiently strong rope with which to fasten the anchor pulley or snatch-block, and neglected to test the sling-rope which was used; (4) maintained a shaft which was so small that articles could not be hoisted through it freely and without striking against the under side of the second floor, thus involving a risk or danger; (5) and permitted the flooring at the edge of the hatch to become slippery, and hence creating a risk or danger which would be involved in the work of receiving articles hoisted through the hatch.

The defendants filed separate answers and each denies that Malloy was working for the company or

carrying out an order given by Camp when injured, or that either of the defendants was negligent in any of the particulars enumerated by the plaintiff. Each defendant alleges affirmatively as a further and separate defense that Malloy was injured

"when the said plaintiff was occupied in and about his own personal business and affairs and such as had no connection with or relation to the business or affairs"

of the Marshall-Wells Hardware Company; and that his injury was "the result of his own acts," and if there was any element of negligence it was not the negligence of either defendant. In addition to the denials and the defense already mentioned the company pleads two other defenses, one of which is to the effect that the Circuit Court lost jurisdiction when the company filed a petition and bond for the removal of the cause from the Circuit Court for Multnomah County to the District Court of the United States for the District of Oregon, while the other avers that a judgment was rendered against the plaintiff in an action prosecuted by him against the corporation for the injury received in the barn.

The assignments of error relate to the refusal of the Circuit Court to grant the application for removal to the federal court, the admission of certain testimony given by the witnesses Frank A. Doney, Philip Erickson and William Malloy, denial of the motion for an involuntary nonsuit, the giving of specified instructions, and the refusal to give certain instructions requested by the defendants.

REVERSED IN PART AND AFFIRMED IN PART.

For appellants there was a brief over the names of *Messrs. Emmons & Webster* and *Mr. J. L. Conley* with oral arguments by *Mr. Lionel R. Webster* and *Mr. Conley.*

For respondent there was a brief over the names of *Mr. A. H. McCurtain, Mr. J. W. Kaste, Messrs. Wilbur, Spencer & Beckett* and *Messrs. Bauer & Greene,* with oral arguments by *Mr. McCurtain, Mr. Kaste* and *Mr. S. C. Spencer.*

HARRIS, J.—21. The evidence shows that Malloy brought an action against the Marshall-Wells Hardware Company for damages on account of the injuries sustained by him and that such action terminated in an involuntary judgment of nonsuit. This judgment did not bar the instant action: Section 184, L. O. L.

The plea that the Circuit Court lost jurisdiction when the company filed a petition for removal cannot be sustained, for the reasons stated by Mr. Justice McCamant in the opinion rendered after the first hearing of the appeal.

An examination of the record convinces us that the testimony of the witnesses Frank A. Doney, Philip Erickson and William Malloy was properly received and was admissible for the purposes stated in the original opinion.

We are urged to pause and consider most carefully before definitely committing ourselves to the construction which the original opinion places upon Chapter 332, Laws of 1913, amending Section 171, L. O. L. Another minute examination of this question persuades us to concur with the reasoning, so convincingly expressed by Mr. Justice McCamant, and we therefore reaffirm what is said in the original opinion concerning the form of a bill of exceptions. To the argument that this conclusion overrules certain prior decisions, we reply by borrowing the language used by John Philpot Curran when presenting a motion for a new trial for A. H. Rowan: the high office of the

court "is never so dignified as when it sees its errors and corrects them."

22. The remaining assignments of error relate to the denial of the defendants' motion for a nonsuit and to the giving as well as the refusal to give certain instructions; and the decision of all these assignments of error depends upon whether Malloy was injured while working for the company. The plaintiff contends that he was engaged in work for the corporation and that he was performing such work in compliance with orders given by Camp, the superintendent, while the defendants strenuously insist that Malloy was hurt at a time when he was working for himself and not for the company. If there was no evidence at all tending to show that Malloy was working for the Marshall-Wells Hardware Company then the trial Court erroneously instructed the jury and the judgment must be reversed; but if there was evidence tending to show that Malloy was injured while performing work for the company, then the question of whether or not he was in truth working for the company was one of fact for the jury to determine from the evidence and that question of fact cannot be re-examined or decided by this court: *Sullivan* v. *Wakefield*, 65 Or. 528, 535 (133 Pac. 641). It is necessary to give an account, more or less in detail, of the duties imposed upon the plaintiff, the authority exercised by Camp, the hatch and appliances used for hoisting articles to the second floor of the barn, and the wood hauled to the barn.

In his capacity as barnman or barn boss Thomas Malloy was obliged to arise about 4:15 each morning and feed, water and curry the horses so that they would be ready for the teamsters to harness by about 6:30 A. M. After the teamsters had gone with the

horses the plaintiff cleaned the barn and this work usually kept him engaged until about noon when the teamsters returned with the horses so that they could again be watered and fed. From one o'clock until about 4 P. M. Malloy did not have much work to do except to answer the telephone and wait on such customers as might wish to purchase gasoline, a supply of which was kept at the barn not only for the automobiles used by the company but also for sale to the public. About 4 P. M. Malloy started in to make preparations for the return of the teams and vehicles and as a rule he did not complete his day's work until 8 or 9 P. M. If, however, he washed the trucks, wagons or automobiles his work was not finished until a later hour. If a horse became sick at night and needed attention, Malloy "had to get up and do it." As Malloy expressed it, he "was on duty 24 hours a day." No employees worked under Malloy; he had no control over the teamsters; he was not a foreman. Whenever hay was hoisted to the second floor, however, Malloy "attended to the taking of this hay up there; he managed that" and the men sent to assist in hoisting the hay did what Malloy told them to do while engaged in that work. Malloy had no authority to buy or sell horses or to purchase feed except possibly in small quantities; and, moreover, he was obliged to secure the approval of Camp before he could procure anything from the warehouse for use in the barn. Malloy's books showing sales of gasoline were O.K.'d by Camp. On practically all matters, except the daily routine work done in the barn, Malloy first reported to Camp and secured directions before attempting to act.

R. A. Camp had acted as superintendent since 1904 and had "direct charge of the office affairs and gen-

eral charge of the warehouse, the machine shop and stables.'' Several of the teamsters were hired by Camp although Harvey seems to have employed most of the teamsters who entered the service of the company. The barnman called upon Camp for orders, but if Camp could not be found then Harvey was called upon. Thomas Malloy says that Camp visited the barn regularly once or twice a day with the exception of a single period covering a few weeks. W. J. Miller, who had charge of the barn in February, 1916, stated that Camp "used to come up to the barn every morning." Camp bought and sold horses for the company. Thomas Malloy testified that the hatch was enlarged pursuant to orders given by Camp. At some time subsequent to September 11, 1915, William Malloy built a railing around the hatch; afterwards he took the railing down, but according to his testimony, "Mr. Camp told me to put it back afterwards." A notice containing rules and regulations for the guidance of teamsters and the barnman over the letters R. A. C., Camp's initials, was posted near the door to the wash-room. Camp caused a small workshop to be built on the second floor and a paint-shop on the first floor. Camp exercised supervising authority not only over Thomas Malloy, but also over William Malloy, who acted as barnman from September 16, 1915, to February, 1916, as well as over W. J. Miller, who succeeded William Malloy.

The hatch was in the second floor when the company first occupied the barn. An ordinary hay-carrier and track were built in next to the roof. The hay-carrier was so arranged that hay and other articles could be hoisted through the hatch and by means of the carrier conveyed to other parts of the loft. After being used a couple of years the hay-carrier broke and a pulley

was then fastened to the carrier track above the hatch and a rope was run through the pulley. Thomas Malloy swore that "it was the men from the warehouse that first rigged it (block and tackle) up." At first the hatch was only three feet by four feet in size and had but one door; but about a month after the company took possession of the barn the opening was enlarged so as to make its dimensions about four feet by six feet, and two doors were placed over the hatch, although the witness W. J. Miller says that the doors were open "mostly." Thomas Malloy testified that the hatch was enlarged pursuant to directions given by Camp. The pulley and rope were used in hoisting hay, grain, feed, wood and other articles from the first floor through the hatch and on to the second floor. William Malloy says that the hay and grain were hoisted to the second floor "afternoons and evenings, just depending on when the grain and hay came," and

"if there was enough teamsters, the teamsters would help. If there was not, sometimes they would send up a man, and sometimes they would not, to help put it away";

but if, however, a carload of hay or grain was received at the barn "they always put a gang on it." When they "put a gang on it" the hay or grain was pulled "up by hand," and a snatch-block or anchor-pulley was not used. Whenever articles were not hoisted to the second floor "by hand" the snatch-block was used just as it was used when the plaintiff was hurt. Three teamsters, Philip Erickson, Ed Lahey and Rex Gable, each testified that he had helped Malloy hoist hay with the use of the two pulleys and rope; and W. J. Miller, another teamster, stated that he had assisted in taking wood as well as hay to the second floor with the aid of the two pulleys and the rope. Gable said that during

the time of his employment from 1910 to 1912 the snatch-block was fastened to a board nailed across the end of a stall as many as 15 or 20 times. When asked: How many times he had "rigged up that apparatus to take things upstairs?" William Malloy answered: "Several times, a good many times." Thomas Malloy stated that the anchor-block and sling-ropes were "used 10 or 12 times a year." When the hay-carrier was installed a piece about 30 feet in length was cut off the main rope which was used on the carrier and this piece was made up into four sling-ropes. The original purpose was to use these sling-ropes "as and for a sling-rope * * before the track was broke down," but after the pulley was fastened to the hay-carrier track one of the sling-ropes was always used "for an anchor rope" for the snatch-block for the reason that, according to the testimony of William Malloy, "there was no other rope." The plaintiff testified that the sling-ropes were the only ropes that were "around there for any such purpose as that"; and that they were "used for all kinds of purposes there in the barn." Thomas Malloy also stated that whenever a sling-rope was needed for the purpose of anchoring the snatch-block no particular one was selected but "we just took whichever one came." When the plaintiff and Miller reached the second floor the plaintiff threw two or three of the sling-ropes down to the first floor so that William Malloy could use one of them for anchoring the snatch-block, and it was one of these ropes that was used for tying the block to the board nailed across the end of the stall. Referring to the work of hoisting articles to the second floor with the use of the two pulleys or blocks and the rope, Thomas Malloy was asked: "Was Camp ever around there when you were doing this

work?'' and he answered thus: ''Well, I think he was sometimes: I could not say for sure though. He was there sometimes when there was hay being hoisted up and grain also.''

The accident occurred about 5 o'clock Saturday afternoon. While the teamsters did not ordinarily finish their work by noon on Saturdays, still if a teamster did complete his work by noon or at any hour in the afternoon before the usual quitting time and returned to the barn with his horses the remainder of the day was his ''own time,'' and he owed no further duties to the Marshall-Wells Hardware Company until the following Monday morning. William Malloy, who drove the horse when his father was hurt, worked for the company; but he had finished his work and was helping with the wood because his father asked him to help. W. J. Miller ''pulled in the barn about 4 o'clock'' and that was the end of his ''day for Marshall-Wells''; and not having anything else to do and wishing to help the plaintiff, Miller helped Thomas Malloy put the wood upstairs when asked by the latter. The plaintiff had not done all his chores when injured, although he ''had part of them done.''

It will be recalled that Camp directed the plaintiff to move to the new barn in October, 1910; and it may be added that when the plaintiff went to the new barn he did so with the understanding that he was to move his family to the barn and live there. Thomas Malloy testified that Camp ''told me that I should move my family to those rooms as quick as possible.'' The plaintiff moved to the apartments in the barn; but his wife and children were not able to follow him until five or six days afterwards. Thomas Malloy states that when he moved into the apartments he found ''a big pile of wood,'' consisting of ends of boards piled

on the second floor of the barn and next to a door leading into the apartments.   William Malloy said that the pile contained "a scant cord."   In connection with the incident of the plaintiff being directed to move to the new barn with his family a very significant circumstance is found in a conversation which plaintiff claims he had with Camp.   Thomas Malloy says that Camp came to the new barn one morning after the first pay day "and looked around and saw that everything was all right," and before going away he said:

" 'Tom, there should be some arrangements made about your wages or salary here.'   I stopped and thought it over a minute or so and says, 'Well, it is up to you.'   He said, 'Your salary will be $70 a month; those rooms upstairs, free wood, free water, free light and free wood.'   Now, the free wood part of it, he drawed back a little bit on that.   He said to me that he didn't think I would ever have to buy any wood, that there would be all kinds of scrap wood at the warehouse; so I took it for granted that my wood would be free."

The room on the first floor, referred to as the dining-room, was furnished with tables, benches and a stove for the use of teamsters at the noon hour.   The teamsters used the stove for warming themselves and for heating coffee.   There were two places in the barn where wood was burned: one, the apartments where the plaintiff lived with his family; and the other, the stove used by the teamsters.   With the exception of four or five loads of cordwood and slabwood purchased by the plaintiff, and two sacks of coal which the company caused to be sent to the barn for the use of the teamsters, the only fuel burned by the plaintiff or the teamsters came from the warehouse.   The evidence shows that there was a daily accumulation of ends of boards and scraps of wood in the warehouse where

goods and wares were received and unpacked and again packed for delivery to customers. The defendants contend that while the plaintiff and teamsters were at liberty to help themselves to the wood which accumulated in the warehouse, nevertheless they were not obliged to do it, and the defendants insist, too, that the company did not recognize any obligation to furnish wood to the plaintiff or to the teamsters. The evidence shows that if at any time there was no wood on the first floor of the barn the teamsters went upstairs and took wood from the pile next to the Malloy apartments. In further support of their position that the company did not consider itself under any obligation to furnish wood to the plaintiff, the defendants point to the fact that on one occasion about two or three weeks prior to the accident the plaintiff hauled three or four loads of wood from the warehouse in the evening after working hours. For the purpose of showing that the company recognized an obligation to furnish wood to him, the plaintiff points to evidence showing that at different times covering the period from 1910 to the date of the accident several teamsters hauled wood to the barn during working hours and pursuant to the orders of Harvey or Camp; and that wood was not only hauled to the barn by those teamsters, but was taken upstairs by them in compliance with directions given by Harvey or Camp. The plaintiff also explains that when he hauled the three or four loads after working hours he was following orders sent to him. While it is true that the teamsters sometimes hauled boxes filled with wood from the warehouse when they went to the barn for noon, it is also true that teamsters hauled wood from the warehouse to the barn during working hours. Frank A. Doney "worked in the warehouse a while, cleaning up part

of the time," and pursuant to directions given by Jim Carr, who had control over that work, Doney "cleaned and swept around there, picking up odds and ends and pieces of boards" and "laid them aside until morning to be sent down on the elevator" for "they were to go to the barns." Commencing with 1910 Rex Gable worked as a teamster for about two and a half years, and he says that during that period the teamsters hauled wood from the warehouse and put it under the stairway in the barn, "except sometimes they was taken upstairs." Philip Erickson worked as a teamster from April, 1913, until June, 1916, and he testified that in the fall of 1915 at some time prior to the time when Malloy was hurt he hauled three or four loads of wood from the warehouse in obedience to orders given by Harvey, and that he deposited the wood in the barn "right by the corner behind the little auto shed"; and Erickson also stated that he did this hauling "as a special trip" and that he did not do it when going to or from his work at night. Ed Lahey, another teamster who was in the service of the company for a year commencing with April, 1915, testified that he hauled five or six loads of wood from the warehouse to the barn before Malloy was hurt; that Harvey told him to haul this wood; that he did the hauling during working hours and not at the noon hour or in the evening and that he piled the wood "right in the automobile garage." W. J. Miller worked for the defendant for a period of seven months commencing with August 3, 1915, and he testified that prior to the time of the accident he hauled a load of wood about 11 o'clock one morning from the warehouse to the barn in obedience to directions given by Harvey "to haul it up to the barn"; and that he put the wood "back along the automobile shed there." Another witness, Amos A.

Abert, drove a truck from October, 1913, until November 5, 1914, and he told the jury that he frequently took wood from the warehouse to the barn "just whenever we didn't have anything to do and there was anything to take up." This witness also testified that at least on one occasion Harvey told him to take wood from the warehouse to the barn and to put the wood "up in the loft." Abert further stated that about three months before he left the service of the company, and while at the warehouse, Camp told me to take "the wood (pieces of boxes in the warehouse) up in the barn and put it up in the loft." The load hauled "by orders of Mr. Camp" and the one hauled "by orders of Mr. Harvey" were hoisted by means of a block and tackle through the hatch and on to the second floor and then piled next to Malloy's apartments by Abert and some other drivers. At least one of the loads hauled by Abert was taken to the barn during working hours, and the fair inference is that the other load was also hauled during working hours. It appears from the testimony that for some indefinite period after 1910, wood hauled from the warehouse was deposited near the foot of the stairs in the barn. Malloy had constructed a bin near the foot of the stairway for the purpose of holding the wood deposited there. It appears that some of the teamsters had thrown some waste into the bin. Upon discovering this waste and to avoid the danger of fire, Camp ordered Malloy to tear out the bin and clean up the floor at that place. Malloy obeyed the order, tore out the bin and moved the bin and the wood upstairs; and thereafter apparently all or at least most of the wood taken to the barn, when deposited on the first floor, was placed in or against the so called auto shed. During the year 1915 the company added three stories to its warehouse,

making seven in all.   An unusually large quantity of
ends of boards accumulated at the warehouse as the
result of this construction work.   When Thomas Mal-
loy was hurt ten or fifteen loads had been hauled and
deposited at or near the "auto shed"; and in connec-
tion with the fact that there was such a large quantity
of wood dumped at this place on the first floor of the
barn it is appropriate to call attention to a conversa-
tion which Thomas Malloy claims to have had with
Harvey a short time, probably three or four weeks,
before the accident.

In the language of Thomas Malloy, while a witness,

"Mr. Harvey, the shipping clerk, came over from the
warehouse to the barn, and he stood around a little
while and then he says, 'Tom, have you got any room
for wood?' I said, 'All kinds of it.' He asked me
where I was going to put it. I told him over in that
corner over there [describing it * * ]. He said he
would send someone up there to the barn that would
back the teams in in unloading. I asked him in what
way he was going to send it and he said he would send
it in boxes and barrels and such like as that. I told
him that it would not be very long, just while the men
were dumping it, and so he didn't say any more, but
went and sent the wood up, and he sent five or six or
eight or ten loads, probably ten loads."

Referring to the three or four loads of wood hauled
one evening after hours, the plaintiff says that two or
three weeks before the accident,

"there was an order sent by one of the boys to me that
the wood upstairs on the second floor * * (of the
warehouse) * * had to be gotten out of there, and it
would have to be taken out after working hours on
account that they were leaving the big elevator upon
those next stories that they were building higher and
there was only one elevator in use, and they were
using that all the time in working hours, and the wood

had to come down on that elevator to be sent to the barn."

The claim made by the plaintiff that he received orders to haul this wood finds some corroboration in the testimony of James A. White, the night watchman at the warehouse, who stated to the jury that "when Mr. Harvey left the place at the quitting hour he told me that Mr. Malloy was coming after the wood and for me to run the elevator" and that Harvey knew that this wood was "going up to the barn." We now direct attention to a conversation which Thomas Malloy says he had with Camp a few days before the accident. The plaintiff points to this conversation in support of his contention that he was ordered by Camp to take the wood upstairs, and that therefore when the plaintiff was injured he was acting in obedience to orders given by Camp. According to the testimony of Thomas Malloy,

"Mr. Camp came in the barn one morning and those stalls were in bad condition and I called his attention again to them, and he went and looked at them and he said, 'Yes, they are in very bad condition,' and he said as soon as they got done work on the warehouse he would get some man to put new bottoms in the stalls. When we got through talking about that he went out in the other department, where the wagons and automobiles were kept, and he asked me, he says, 'Tom, did anybody ever come here to look at any of these extra wagons we had here, those extra wagons for sale?' And I says, 'No, nobody ever came around here, only one man, and he didn't intend to buy a wagon.' He said, 'Did he speak about it?' I said, 'Yes.' He said, 'What wagons did he ask about?' I said, 'The Columbia Hardware wagon.' And he said, 'What price would he pay for it?' I said, 'Fifteen dollars and I knew you would not take that.' So he started over toward these extra wagons standing near

the door and got out by the opposite hall, and when
he got out in the middle of the floor he said, 'Tom,
you have got a pile of wood there.' I says, 'Yes.' He
said—it was piled up and scattered around a little of
it under the wagons—and he said, 'You should have
built a bin around it.' I says, 'There was no necessity
for it, but when I got a little time I was going to move
that wood upstairs.' He says 'Well, it should be taken
out of here, it is in the road.' "

Mrs. Ann Malloy corroborates her husband by tes-
tifying that she was on the first floor cleaning up the
quarters used by the teamsters and heard the following
conversation between her husband and Camp:

" 'Tom, you have a big pile of wood here.' He says,
'It is in the way under the wagons; you ought to pile
it up or do something with it,' and he says, 'Well, I
have not had time to take it upstairs; I was going to
take it up just as quick as I got a little spare time.'
'Well,' he says, 'something ought to be done with it;
it ought to be got out of here.' That is all that was
said."

It will be remembered that the box containing wood
fell back to the first floor when the sling-rope broke.
This box of wood was pushed into the dining-room
and the wood burned by the teamsters in the stove in
the dining-room. Camp placed William Malloy in the
position of barnman after the accident, and on the
following Monday evening after work hours the wood
which had been piled at or against the auto shed was
hoisted upstairs by William Malloy, Leonard Malloy,
Ed Lahey, W. J. Miller and Philip Erickson.

23. There was evidence to support the contentions of
the plaintiff, and while it is also true that the defend-
ants offered evidence which contradicts the evidence
offered by the plaintiff it is not our province to attempt
to ascertain whether Malloy was in truth working for

himself or whether he was hurt working for the company at the time he was hurt, because it was the exclusive province of the jury to determine that question of fact and our only inquiry now is whether the record contains evidence entitling the plaintiff to go to the jury for a decision of a controverted fact. The plaintiff contends that he was to receive free wood as a part of his compensation. It was for the jury to say whether such was the agreement. There was direct evidence tending to show that such was the agreement, and in addition to this direct evidence there was the significant circumstance of wood being piled against the apartments when Malloy moved to the new barn. The plaintiff insists that the alleged agreement concerning free wood was recognized by the company during the entire five year period of Malloy's employment. It was for the jury to say whether hauling wood from the warehouse to the barn by teamsters pursuant to the orders given by Harvey and by Camp constituted recognition of such agreement. The plaintiff contended that he was elevating the wood to the second floor in obedience to orders given by Camp. The conversation attributed by the plaintiff to Camp relative to the removal of the wood from the auto shed was, if believed by the jury, evidence tending to show that Camp ordered the wood taken upstairs. There was evidence from which a jury could conclude that Malloy was to receive as a part of his compensation free wood to be hauled from the warehouse to the barn, that the defendant company recognized such an agreement by causing wood to be hauled from the warehouse to the barn by the company's teamsters and during working hours, and by Harvey, the shipping clerk, and by Camp, the superintendent, each ordering teamsters not only to haul wood to the barn, but to take it up into the loft; that two or three weeks prior to the accident the

plaintiff received express orders to haul wood from the warehouse to the barn; that the wood which was piled in the automobile shed was placed there pursuant to orders given by Harvey; that Camp ordered all the wood which had been piled in the auto shed to be moved, and that Thomas Malloy at the time he was hurt was engaged in carrying out such express order given by Camp; and that the company even recognized an obligation to furnish the teamsters with wood for the reason that on one occasion two sacks of coal were sent to the barn for the use of the teamsters.

If the jury believed the testimony offered in behalf of the plaintiff, then the conclusion is inevitable that most if not all the wood lying in or near the auto shed on September 11, 1915, had been hauled from the warehouse and dumped in the barn pursuant to direct orders given by Harvey and Camp. All that wood, with the possible exception of the three or four loads hauled by the plaintiff, was hauled during working hours by persons acting as employees of the company and at the sole expense of the company. There was much evidence from which the jury could conclude that the company retained its ownership in the wood. The teamsters were at liberty at all times to use from the wood whether lying on the first floor or piled on the second floor. It was for the jury to say whether the wood belonged to the company, or whether it became the property of the plaintiff when he placed it in the boxes to be hoisted upstairs. It was for the jury to decide, too, whether the plaintiff when hoisting the wood was handling Malloy's wood for Malloy's use or whether he was handling the company's wood for the use of the company's employee or employees. Wood had never been deposited at any place on the first floor except at the foot of the stairway and in

or near the auto shed. The place at the stairway had been cleaned up pursuant to Camp's orders, and when he ordered the wood to be taken out of the auto shed it is fair to conclude that he intended that the wood should be taken to the only other place used for storing wood—upstairs; and, indeed, Malloy told Camp that he would take it upstairs. After reading and re-reading the record presented to us and giving to it our most careful consideration, it is our conclusion that the plaintiff was entitled to have the jury determine whether he was engaged in a work for the company when he fell through the hatch and was injured. The court told the jury to find for the defendants if the plaintiff was doing his own work. The instructions were plain and understandable and the jury could not have been misled; and consequently the verdict of the jury is conclusive evidence that the jury found that the plaintiff was doing work for the company at the time of his injury. The instructions of the court presented the respective theories of the litigants. The court gave no instruction which can be said to be prejudicial to the company, and every instruction which the company requested and to which it was entitled was given by the court.

The verdict and judgment were against Camp, the superintendent, as well as against the Marshall-Wells Hardware Company, the employer. Camp admitted that he was a superintendent, and moreover there was ample evidence from which the jury could find that Camp had charge of all the work done in the barn; that he caused the hatch to be enlarged and the block and tackle to be installed so that articles could be hoisted to the second floor; and that he had actual knowledge that the hatch and blocks and tackle were used for the purposes for which they were intended.

The plaintiff contends that since Camp was the super-intendent in charge of the work at the barn, the Employers' Liability Act applies to Camp with the same force and to the same extent as it does to the Marshall-Wells Hardware Company.

24. The Employers' Liability Act presents itself in two aspects, for it imposes two kinds of liability: the one civil, and the other criminal. Section 3 makes it the duty of foremen as well as other persons having charge of the particular work to see that the require-ments of the statute are complied with, and a failure may be punished by a fine or imprisonment or both. Viewed in its criminal aspect the Employers' Liability Act is plainly intended to make a foreman or person having charge of the particular work criminally liable for failure to see that the requirements of the statute are complied with; and to this extent, at least, the act has extended the liability of a foreman.

It is possible, although it is not necessary to decide, that the civil aspect of the statute in turn presents itself in two phases: one where the statute applies with all its incidents and one where it does not. The Employers' Liability Act defines the duties which shall be performed in certain kinds of work, and for con-venience we may treat these defined duties as the prin-cipal element of the statute and all else as incidents; and while it may be assumed that the statute imposes upon a foreman as well as upon the owner the obliga-tion of performing those specified duties, nevertheless it must be remembered that our present inquiry is whether, aside from the specified duties imposed by the enactment, all or any of the incidents which charac-terize the statute are applicable to a mere foreman. If death results from a violation of the Employers' Liability Act certain named persons sue as individuals

and not as representatives of the estate of the deceased, and the right of action is without limit as to the amount of damages; but if the action is not brought under this statute it is prosecuted by a representative of the estate and there is a limit to the amount of damages which may be recovered: Section 380, L. O. L. If an action is governed by the Employers' Liability Act there are certain defenses, including contributory negligence, which cannot be pleaded by the defendant as a bar; but if an action is not governed by this statute, those certain defenses, including contributory negligence, are available as a bar to the action. When we say that an action for damages is completely within the embrace of the Employers' Liability Act we must be understood to mean that the action is one which is properly prosecuted by the person who was injured, or, in case of his death, by an individual belonging to one of the classes of persons specified by the statute, against a proper party defendant who is prohibited from pleading contributory negligence, and certain other defenses, as a bar. We have recently held that one who is a mere member of the public, as distinguished from a person who is an employee or engaged in work on or about a wire charged with a dangerous voltage of electricity, does not come within the complete embrace of the Employers' Liability Act, and that therefore the widow of a mere member of the public who has been killed by coming in contact with an electric wire cannot recover damages from the owner of the wire; but the remedy is an action by a representative of the estate of the deceased: *Turnidge* v. *Thompson*, 89 Or. 637 (175 Pac. 281). There may be persons, as possibly a member of the public, who cannot as a party plaintiff sue an owner under the Employers' Liability Act, even though such owner may owe to the

person suing one or more of the duties prescribed by such act; and although that person as such member of the public may not come within the complete embrace of the statute and cannot sue under the act, it is possible that it may nevertheless be true that such person can sue and allege negligence, and, as was done in *Peterson* v. *Standard Oil Co.,* 55 Or. 511 (106 Pac. 337, Ann. Cas. 1912A, 625), prove the alleged negligence by showing the violation of a duty, imposed by the Employers' Liability Act as a statute enacted for the protection of the public, and upon such proof of negligence be entitled to recover, unless guilty of contributory negligence. Even though an action against a foreman does not come within the complete embrace of the Employers' Liability Act, it is possible that it may nevertheless be true that the foreman may be sued for negligence, and such negligence be proved by showing a failure to perform a duty imposed upon the foreman by the Employers' Liability Act and a recovery had in the absence of contributory negligence, on the theory that the violation of the statute is negligence *per se* under the doctrine announced in *Peterson* v. *Standard Oil Company, supra.* The civil aspect of the Employers' Liability Act then may possibly present itself in two phases: One where the statute is available only for the purpose of fixing the duty of the party sued, and none of the incidents of the statute attend an action for damages; and the other, where both the plaintiff and the defendant are completely within the embrace of the statute so that both the principal element and also the incidents are applicable to an action for a violation of the enactment.

25–27. The trial court charged the jury that if the plaintiff was injured while engaged in work for the Marshall-Wells Hardware Company, and if his injury

was caused by a failure of the company to comply with one or more requirements of the Employers' Liability Act as charged in the complaint, then this statute completely embraced not only the company but also Camp, the superintendent; and hence the concrete question for decision is whether the Employers' Liability Act completely embraces a foreman or superintendent so that the statute, with all its incidents, is applicable in an action for damages against the foreman or superintendent. By its express terms the act has abolished the defense of contributory negligence. Section 6 reads as follows:

"The contributory negligence of the person injured shall not be a defense, but may be taken into account by the jury in fixing the amount of the damage."

In *Schaedler* v. *Columbia Contract Company,* 67 Or. 412 (135 Pac. 536), it was held that Section 6 just quoted does not apply to all actions for personal injuries, but that it only applies to actions brought under the Employers' Liability Act. In other words, what is said in Section 6 is only one way of saying that in any action brought under this statute the contributory negligence of the person injured shall not be a defense; or, to say the same thing in another way, contributory negligence is not available as a defense against any action for damages brought under this statute. The act is entitled, "A bill to propose by initiative petition a law" which among other things declares "what shall not be a defense in actions by employees against employers." The title of the act is a part of the statute and can be looked to for the purpose of ascertaining the meaning of the statute; and, moreover, an act adopted by the people in the exercise of the initiative as well as an act passed by the legislative assembly must comply with the requirements of Article IV,

Section 20, of the State Constitution: *Turnidge* v. *Thompson, supra.* The foreman or superintendent is not an employer; indeed, by the express terms of the statute itself the foreman or superintendent "shall be held to be the agent of the employer *in all suits for damages* for death or injury suffered by an employee." The defense of contributory negligence is only withdrawn from the employer. Even though a foreman may become criminally liable by force of the terms of the Employers' Liability Act and even though it may be possible, but it is not decided, that the failure of a foreman to perform a duty imposed by the act is negligence *per se* within the doctrine of *Peterson* v. *Standard Oil Co.,* 55 Or. 511 (106 Pac. 337, Ann. Cas. 1912A, 625), nevertheless it is obvious that the defense of contributory negligence is not withdrawn from a foreman or superintendent who is not the employer but by the express provisions of the statute is declared to be an agent of the employer.

28. It is true that Section 3, which provides for punishment by fine or imprisonment in case of failure to obey the mandate of the statute, declares that such punishment "shall not affect or lessen the civil liability of such persons as the case may be." It is manifest, however, that the excerpt quoted from Section 3 neither enlarges nor lessens "the civil liability of such persons," but this language is evidently inserted in the section merely for the purpose of removing even the possibility of claiming that punishment by fine or imprisonment shall relieve the person fined or imprisoned from liability for damages. The language quoted from Section 3 simply leaves the subject of civil liability at large; and, moreover, the words, "as the case may be," are themselves significant when con-

sidered in connection with the different classes of persons named in the action.

A careful examination of the Employers' Liability Act, together with its title, makes it obvious that the act does not completely embrace an action for damages against a foreman or superintendent like Camp; and consequently it becomes necessary to reverse the judgment as against Camp. As against the Marshall-Wells Hardware Company the judgment is affirmed; but as against Camp the judgment is reversed.

REVERSED IN PART AND AFFIRMED IN PART.

BURNETT, J.—I dissent from what is said in the opinion of Mr. Justice HARRIS as well as from the language of Mr. Justice McCAMANT in the former decision of this case (173 Pac. 267), on the frame of a bill of exceptions. Otherwise, I concur in the result reached by Mr. Justice HARRIS.

Rehearing denied December 10, 1918.

ON PETITION FOR SECOND HEARING.

(176 Pac. 589.)

In Banc.

For the petition there was a brief presented by *Messrs. Emmons & Webster* and *Messrs. Stapleton, Conley & Stapleton.*

*Mr. A. H. McCurtain, Mr. J. W. Kaste, Messrs. Wilbur, Spencer & Beckett* and *Messrs. Bauer & Greene,* opposed.

HARRIS, J.—The petition for a rehearing filed by the Marshall-Wells Hardware Company presents no

new questions. It is stated, however, in the petition that the Circuit Court for Multnomah County did in truth enter an order on February 7, 1917, extending the time within which the defendant could plead to February 17, 1917, and that therefore the petition and bond for removal to the federal court alleged to have been filed on February 15, 1917, were filed within the time required by law, and consequently operated to deprive the state court of jurisdiction.

The complaint was filed on December 13, 1916, and the company admits that it was served with a copy of the summons and of the complaint on December 14, 1916. The second separate answer pleaded by the company alleges that on February 15, 1917, this defendant filed a petition and bond for the removal of the cause from the state court to the federal court; that the state court refused to make an order removing said cause, "but on the contrary directed, ordered and adjudged that the same be not removed." A copy of the petition and bond alleged to have been filed on February 15, 1917, are attached to the answer and marked Exhibit 1. After reciting the date of the commencement of the action and stating the date when the company was served with summons and complaint Exhibit 1 avers that within the time allowed by law the company filed a petition for removal of the cause to the federal court and a copy of this petition is marked Exhibit "A" and is attached to Exhibit 1. Exhibit 1 avers that upon the filing of Exhibit "A" the cause was removed to the federal court;

"That thereafter the plaintiff filed a motion to remand said cause to the state court which motion was allowed and said cause was duly and regularly remanded. That thereupon and pursuant to the law of this state and the rules and practice thereof and of this court an order was duly and regularly made and en-

tered herein extending and enlarging the time within which this petitioner was required to plead or answer herein to and including February 17, 1917.''

The reply filed by the plaintiff denies every allegation contained in the answer,

''except that said plaintiff admits that after the time allowed by law for the removal of this cause to the District Court of the United States for the District of Oregon, said defendant attempted to remove the same but was unsuccessful.''

In brief, the answer shows through Exhibit 1 that the company filed two petitions for removal. The first petition was granted and the cause was removed to the federal court; but upon motion of the plaintiff the federal court remanded the cause to the state court. The defendant is relying upon the second petition for removal; and the company must therefore present a record showing that the second petition was filed in time. The answer merely alleges that the petition was ''duly and regularly filed'' pursuant to the acts of Congress. The reply denies that the petition was filed in time. Aside from the allegation quoted from the body of the answer and the excerpt taken from Exhibit 1 there is nothing in the record presented to us to show that the state court made an order extending the time within which the company could plead or the date when such order was made. Aside from the allegations in the answer there is nothing in the record to show the date upon which the second petition was filed.

29. The petition for rehearing states that the order of removal, based upon the first petition, was signed and filed on December 22, 1916; that the transcript on removal was filed on January 17, 1917, in the federal court; that on January 24, 1917, the plaintiff filed a petition to remand; that on February 5th, the federal court made an order remanding the case to the state

court; that on February 7th, the state court made an order extending the time within which defendant could plead to February 17, 1917; that the second petition for removal was filed on February 15th, and this application was denied by the state court on February 16, 1917. The record upon which this appeal was twice argued and twice decided does not give us all the information contained in the petition for a rehearing; and it is therefore suggested in the petition for a rehearing that we order the record to be supplemented so as to supply the omissions. The appeal has been twice argued; the question arising out of the second affirmative defense pleaded by the defendant company has been twice decided adversely to its contention; and we would not now be warranted in making the suggested order: *State* v. *Jennings,* 48 Or. 483, 494 (87 Pac. 524, 89 Pac. 421); *Noble* v. *Watrous,* 84 Or. 418, 426 (163 Pac. 310, 165 Pac. 349); 3 Cyc. 144; 4 C. J. 497.

30. Even though the dates, orders and papers are as stated in the petition for a rehearing, and even though it be assumed that an order extending the time to plead operates as an extension of the time within which a petition for a removal may be filed, nevertheless the company cannot prevail. The second petition for removal was simply an enlarged edition and amplification of the first petition; and therefore in denying the second application the state court merely "did no more than bow to the decision and order of the federal court when it remanded the record": *McLaughlin* v. *Hallowell,* 228 U. S. 278, 286 (57 L. Ed. 835, 33 Sup. Ct. Rep. 465); *St. Paul & Chicago R. Co.* v. *McLean,* 108 U. S. 212 (27 L. Ed. 703, 2 Sup. Ct. Rep. 498).

It will not be necessary further to discuss the questions mentioned in the petition for a rehearing, but it is sufficient to say that we have carefully considered the

arguments again presented by the company and come to the same conclusion which we reached upon the hearing *in banc*. The petition for a rehearing is therefore denied.　　　　　　　　　　　　REHEARING DENIED.