Argued June 28, reversed October 1, 1918.

# TURNIDGE *v.* THOMPSON.

(175 Pac. 281.)

**Electricity—Insulation.**

1. Laws of 1911, Chapter 3, Section 1, providing that one controlling the transmission of electricity must insulate the wire at all points where the public are liable to come in contact with it, does not require insulation on a wire, properly attached to poles, at a point 30 feet from a pole.

**Statutes—Title—Initiative.**

2. Article IV, Section 20, of the Constitution, providing that every act shall embrace but one subject, etc., applies to an act adopted by the people in the exercise of the power of the initiative.

**Statutes—Construction—Title.**

3. Since every act must have a title expressing the subject matter, the title necessarily becomes a part of the act, and offers valuable help in construing the act and determining the legislative intent.

**Electricity—Operation of Employers' Liability Act—"Public."**

4. Employers' Liability Act, Section 1, providing that persons transmitting electricity shall insulate wires at points where public may come in contact with them, does not give a member of the public a right of action, unless he is an employee, or is engaged in a hazardous employment; the word "public" relating only to criminal liability under the act.

> [As to what is "accident arising out of, and in course of, employment" within Employers' Liability Act, see note in **Ann. Cas.** 1914D, 1284.]

From Yamhill: HARRY H. BELT, Judge.

Department 2.

Joseph P. Turnidge met his death by coming in contact with an electric wire, charged with 2,300 volts of electricity, and his widow Nellie E. Turnidge brought this action against J. T. Thompson and a corporation known as the Sheridan Light & Power Company. A judgment of nonsuit eliminated the Sheridan Light & Power Company, but the plaintiff was awarded a verdict and judgment against Thompson, and he appealed.

Joseph P. Turnidge was killed while passing over a field which embraces between 50 and 70 acres, is owned by Amos Fuqua and was occupied by F. B. Leslie as a tenant. The Fuqua premises are bounded on the west by the Willamina River, on the east and on the north by a county road and on the south by a fence. There is a fence along the line between the field and the county road; and hence the premises are inclosed by a fence along the north, east and south lines, and by a river on the west. There is a fringe of brush and timber along the east bank of the river.

J. R. Fagerstrom owns a farm on the west side of the Willamina River and opposite the Fuqua premises. The house and barn on the Fagerstrom farm are located in a northwest direction from the southwest corner of the Fuqua premises. The defendant J. T. Thompson owns an electric light plant in Willamina about two miles in a southerly direction from the Fuqua property. Thompson maintains a transmission line which extends from his plant in Willamina along the county road to and past the Fuqua premises. This is a main line and is located on the east side of the county road which bounds the Fuqua premises on the east and on the north. F. R. Fagerstrom maintains electric lights in his house and barn and the electricity for the lights is carried through a wire which is connected with the main line in the county road at a point directly opposite the southeast corner of the Fuqua premises. The line to the Fagerstrom farm is supported by poles with cross-arms into which are screwed wooden pegs. Glass insulators are placed upon these wooden pegs and the wire is fastened around the insulators. Commencing at the southeast corner of the Fuqua premises the poles for the Fagerstrom wire are set along the south line fence until

the tenth pole is reached; from pole No. 10 the line is carried in a northwesterly direction towards the Fagerstrom house and barn, thus cutting off the southwest corner of the Fuqua premises. Pole No. 11 is near the edge of the brush which fringes the east bank of the river.

It will be recalled that the Fuqua property is bounded on the north by a county road. As this road continues towards the west, it passes a schoolhouse near the northwest corner of the Fuqua property, crosses a bridge which spans the river, and then passes a farm residence where Joseph P. Turnidge lived with his family. The Turnidge house is located a short distance west of the bridge and on the south side of the county road. "On the evening" of March 26, 1917, the decedent went "across the bridge and between the schoolhouse and the river along the bank and down through the Fuqua place." Alarmed at the failure of her husband to return, the plaintiff caused two of her neighbors to search for him. About 7 o'clock that evening the neighbors found the lifeless body of Turnidge lying across the Fagerstrom wire at a point between pole No. 10 and pole No. 11 and about 30 feet east of pole No. 11. The burns on his hands and chest proved that his death was caused by coming in contact with the wire. When the body was removed the wire immediately raised up about four feet from the ground. The next morning it was ascertained that the wooden peg that had been set in the cross-arm on pole No. 11 had broken off on account of decay and that a bracket nailed to a tree which served as pole No. 12 had broken loose, thus releasing the line from poles 11 and 12 and permitting the wire to sag so that at the place where Turnidge was killed the wire hung only about four feet from the ground.

There was a trespass notice posted on a tree near the southwest corner and a like notice posted at the southeast corner of the Fuqua premises. The notices were printed and read thus:

"We the undersigned do HEREBY FORBID any trespassing or HUNTING on our premises. THIS MEANS YOU."

The names of Amos Fuqua, F. B. Leslie and six other persons were printed on the notices. Leslie appeared as a witness and testified that the purpose of the trespass notices "was to keep hunters off"; and when asked: "Did that [the notices] apply to people who lived up in that country?" he answered: "It never applied to our neighbors, never seemed to me"; and the succeeding question and answer are as follows:

Q. "Was that generally understood in the neighborhood? A. Amongst what neighbors was there, I couldn't tell who was there, I know several of us talked it over."

Homer Holman, one of the neighbors who found the body, testified that there is a "trail or byway" along the course that he took "in following up the trail of Turnidge" and that such trail crosses the fence on the south side of the Fuqua land "just below" an ash tree which would be about midway between poles 10 and 11 if pole 11 were on the fence line instead of north of it. Ben Richards stated that "the neighbors living there had an opening down through there, a little cut to town, and if they wanted to go through there they went through there on foot." Fred Churchman testified as follows:

"It seemed to be the custom of people, seems to be a cut-off, and a good many people go down past there and turn down the creek by De Lashmutts and out on

the road again, save a good deal, and a good many people went through there.''

The plaintiff explained to the jury that she had seen strangers as well as neighbors leave the road at the bridge and start down on the east side of the river ''along the edge of the field in the Fuqua place.'' The defendant and Albert E. Shinkle both testified that there were no indications of a trail or foot-path near the place where Turnidge was killed and Leslie swore that there was no trail ''on that edge'' of the Fuqua property; that ''we plow right up to the river'' and that the ground at the point where Turnidge was killed ''had been cropped off the year before, that fall.'' There is no gate at or near the southwest corner of the Fuqua property. On the south side of and adjacent to the fence along the south boundary of the Fuqua premises is a ditch, called by one witness ''a wet weather ditch.'' Opposite the place of the accident the ditch is about 10 feet deep and about 12 feet wide ''at the top,'' although by going ''down in the ditch you can step across the water and up on the other side.'' The ditch has no ''foot-rail or crossing place.''                    Reversed With Directions.

For appellant there was a brief with oral arguments by *Mr. W. O. Sims* and *Mr. Oscar Hayter.*

For respondent there was a brief over the names of *Mr. Frank Holmes* and *Messrs. Heider & Mark,* with an oral argument by *Mr. Holmes.*

HARRIS, J.—The plaintiff claimed that the defendant Thompson owned and controlled the line from the county road to the Fagerstrom premises. Thompson insisted that the line was owned and controlled by

Fagerstrom and that he, the defendant, should be exonerated from liability, on the theory that the electricity was delivered to Fagerstrom at the county road where connection was made with the main line and therefore the defendant would not be liable for anything occurring after the electricity passed the place of delivery. The question of ownership was raised by the pleadings and was submitted to the jury with appropriate instructions. There was evidence upon both sides of the question, and since the verdict of the jury necessarily involved a finding that Thompson owned and controlled the line to the Fagerstrom buildings we must assume, without further inquiry, that Thompson owned or at least controlled the line.

This case was tried by the plaintiff upon the theory that the facts brought it within the embrace of the Employers' Liability Act: Chapter 3, Laws 1911. At the time of his death the decedent was neither an employee of the defendant nor of any other person. The place was private property; it was not a county road, or public park or such like. Viewed in a light most favorable to the plaintiff the decedent was on the Fuqua property only by sufferance. It is true that trespass notices were posted on the premises and yet the decedent should not be deemed a trespasser for the reason that neighbors had been accustomed to cross the Fuqua property as a short cut to Willamina and, moreover, Leslie did not intend that the notices "applied to our neighbors." The question for decision is whether the Employers' Liability Act is applicable to the facts presented by the record; and since the question to be decided requires an examination of the statute we here set down the entire act together with its title.

"A BILL to propose by initiative petition a law providing for the protection and safety of persons engaged in the construction, repairing, alteration, or other work, upon buildings, bridges, viaducts, tanks, stacks and other structures, or engaged in any work upon or about electrical wires, or conductors or poles, or supports, or other electrical appliances or contrivances carrying a dangerous current of electricity; or about any machinery or in any dangerous occupation, and extending and defining the liability of employers in any or all acts of negligence, or for injury or death of their employees, and defining who are the agents of the employer, and declaring what shall not be a defense in actions by employees against employers, and prescribing a penalty for a violation of the law.

"Be it enacted by the people of the State of Oregon:

"Section 1. All owners, contractors, subcontractors, corporations or persons whatsoever, engaged in the construction, repairing, alteration, removal or painting of any building, bridge, viaduct, or other structure, or in the erection or operation of any machinery, or in the manufacture, transmission and use of electricity, or in the manufacture or use of any dangerous appliance or substance, shall see that all metal, wood, rope, glass, rubber, gutta percha, or other material whatever, shall be carefully selected and inspected and tested so as to detect any defects, and all scaffolding, staging, false work or other temporary structure shall be constructed to bear four times the maximum weight to be sustained by said structure, and such structure shall not at any time be overloaded or overcrowded; and all scaffolding, staging or other structure more than twenty feet from the ground or floor shall be secured from swaying and provided with a strong and efficient safety rail or other contrivance, so as to prevent any person from falling therefrom, and all dangerous machinery shall be securely covered and protected to the fullest extent that the proper operation of the machinery permits, and all shafts, wells, floor openings and similar places of danger shall be inclosed, and all machinery other than that operated by hand power

shall, whenever necessary for the safety of persons employed in or about the same, or *for the safety of the general public,* be provided with a system of communication by means of signals, so that at all times there may be prompt and efficient communication between the employees or other persons and the operator of the motive power, and in the transmission and use of electricity of a dangerous voltage full and complete insulation shall be provided *at all points where the public* or the employees of the owner, contractor or subcontractor transmitting or using said electricity are liable to come in contact with the wire, and dead wires shall not be mingled with live wires, nor strung upon the same support, and the arms or supports bearing live wires shall be especially designated by a color or other designation which is instantly apparent and live electrical wires carrying a dangerous voltage shall be strung at such distance from the poles or supports as to permit repairmen to freely engage in their work without danger of shock; and generally, all owners, contractors or subcontractors and other persons having charge of, or responsible for, *any work involving a risk or danger to* the employees or *the public,* shall use every device, care and precaution which it is practicable to use for the protection and safety of life and limb, limited only by the necessity for preserving the efficiency of the structure, machine or other apparatus or device, and without regard to the additional cost of suitable material or safety appliance and devices.

"Sec. 2.    The manager, superintendent, foreman or other person in charge or control of the construction or works or operation, or any part thereof, shall be held to be the agent of the employer in all suits for damages for death or injury suffered by an employee.

"Sec. 3.    It shall be the duty of owners, contractors, subcontractors, foremen, architects or other persons having charge of the particular work, to see that the requirements of this act are complied with, and for any failure in this respect the person or persons delinquent shall, upon conviction of violating any of the

provisions of this act, be fined not less than ten dollars, nor more than one thousand dollars, or imprisoned not less than ten days, nor more than one year, or both, in the discretion of the court, and this shall not affect or lessen the civil liability of such persons as the case may be.

"Sec. 4.    If there shall be any loss of life by reason of the neglects or failures or violations of the provisions of this act by any owner, contractor, or subcontractor, or any person liable under the provisions of this act, the widow of the person so killed, his lineal heirs or adopted children, or the husband, mother, or father, as the case may be, shall have a right of action without any limit as to the amount of damages which may be awarded.

"Sec. 5.    In all actions brought to recover from an employer for injuries suffered by an employee the negligence of a fellow-servant shall not be a defense where the injury was caused or contributed to by any of the following causes, namely: Any defect in the structure, materials, works, plant or machinery of which the employer or his agent could have had knowledge by the exercise of ordinary care; the neglect of any person engaged as superintendent, manager, foreman, or other person in charge or control of the works, plant, machinery or appliances; the incompetence or negligence of any person in charge of, or directing the particular work in which the employee was engaged at the time of the injury or death; the incompetence or negligence of any person to whose orders the employee was bound to conform and did conform and by reason of his having conformed thereto the injury or death resulted; the act of any fellow-servant done in obedience to the rules, instructions or orders given by the employer or any other person who has authority to direct the doing of said act.

"Sec. 6.    The contributory negligence of the person injured shall not be a defense, but may be taken into account by the jury in fixing the amount of the damage.

"Sec. 7.    All acts or parts of acts inconsistent herewith are hereby repealed."

1. The duties which the Employers' Liability Act imposes upon an owner engaged in transmitting electricity are prescribed by Section 1 of the statute. An analytical outline of this section may be found in *Camenzind* v. *Freeland Furniture Co., Ante,* p. 158, 174 Pac. 139, and possibly an inspection of that outline may assist the reader in construing the statute. Turning to Section 1 it will be observed that, among other things, (1) an owner must see that all wood shall be carefully selected and inspected and tested so as to detect any defects; (2) full and complete insulation shall be provided at all points where the public or the employees of the owner, contractor or subcontractor transmitting the electricity are liable to come in contact with the wire; and (3) all owners having charge of any work involving a risk or danger to the employees or the public shall use every device, care and precaution which it is practicable to use for the protection and safety of life and limb. We shall assume, without deciding, that the duty to select, inspect and test so as to detect defects applies not only to the work of installing a transmission line, but also to the use of the line after it has been permanently installed. If the line had not broken from its fastenings the point where Turnidge was killed would not have been a point where the public or employees of the owner were liable to come in contact with the wire; but when the wire fell from the poles and sagged towards the ground it presented points where persons were liable to come in contact with it. So long as the wire remained attached to the poles there was no duty to insulate the wire at a point 30 feet east of pole No. 11. The plaintiff contends, however, that since the wire was liable to fall, and when fallen persons were liable to come in contact with it, the owner was obliged to see that the wire

was insulated. While it is doubtful whether the Fagerstrom wire was such an one as the statute requires to be insulated at a point 30 feet east of pole No. 11, we shall nevertheless assume, without deciding, that the Fagerstrom line throughout its entire length was within the embrace of the statute. We shall assume, too, that the *omnibus* clause with which Section 1 is concluded imposes upon every owner of an electric line the duty to use every practicable device, care and precaution for the protection and safety of life and limb.

Having stated what, for the purposes of the discussion, we shall assume to be the abstract duties of the owner of an electric line, as enumerated by the Employers' Liability Act, our next inquiry is whether such owner owes any of those duties to a person situated as Turnidge was when he came in contact with the wire. In brief, the question is: Did Thompson owe Turnidge any of the duties prescribed by the statute, and if he did, is Thompson civilly liable for a violation of any of those duties? From the outset of our inquiry we must remember that the decedent was not an employee of the owner or of any other person; nor was he engaged in work on or about the line.

The plaintiff contends that the Employers' Liability Act is not confined to employees and persons engaged in work on or about the machinery, structures and places enumerated in the statute, but that the legislation also extends to and includes every member of the public. This contention made by the plaintiff is based upon the circumstance that the statute makes it the duty of the owner of a wire carrying a dangerous voltage of electricity to provide full and complete insulation at all points where *"the public or the employees"* are liable to come in contact with the wire.

The word "public" is also found in that part of the act which requires a system of communication whenever necessary for the safety of persons employed about machinery, not operated by hand power, or for the safety of *"the general public"*; and the term is again found in the *omnibus* clause making it the duty of every person having charge of a work involving a risk or danger, "to the employees or *the public*" to use every practicable device, care and precaution for the protection and safety of life and limb.

The defendant argues that the word "public" should be construed to apply only to those places where the people as a whole have a right to be or are expected to be, as for example, county roads, city streets, parks and the like. In the instant case it will not be necessary to attempt a definition of the word "public," or to try to mark the limitations of the term as used in the act; but we shall examine the statute in a light most favorable to the plaintiff, and assume, without deciding, that the term "public" included Joseph P. Turnidge, notwithstanding the fact that, by the mere sufferance of the owner, he was passing over an inclosed field which was private and not public property.

The statute imposes a twofold liability: one civil and the other criminal. Nowhere does the statute state in direct or express terms that a member of the public, who is not also an employee or a person engaged in work on or about a machine, structure or place specified by the act, shall have a right of action for damages. The Employers' Liability Act does not expressly confer upon the public or upon any person as a mere member of the public the right to sue for damages whenever injured. If a person who is simply a member of the public can claim the protection of the Employers' Liability Act and sue an owner of a trans-

mission line carrying electricity he has such right only because of the inferences and implications to be drawn and derived from the use of the word "public" in the three particulars already mentioned. The avowed purpose of the statute was to protect workingmen and working-women; and since the statute is remedial it should be liberally construed so as to accomplish its expressed purpose.

The statute was adopted by the people in the exercise of the power of the initiative. The petition was circulated under the direction of the Oregon State Federation of Labor and was filed with the Secretary of State by J. F. Cassidy, Secretary of the Oregon State Federation of Labor. Upon the authority of Section 5, Chapter 226, Laws 1907, the Secretary of State transmitted a copy of the measure to the Attorney General with a request that the latter prepare a ballot title. The Attorney General prepared a ballot title which reads as follows:

"A bill for a law requiring protection for persons engaged in hazardous employments, defining and extending the liability of employers, and providing that contributory negligence shall not be a defense."

J. F. Cassidy was notified of the form submitted by the Attorney General and the form was apparently satisfactory for it was printed upon the ballots submitted to the electorate. It will be noticed that this ballot title undertakes to advise the voters that they are to vote on a measure which (1) requires protection for persons engaged in hazardous employments and (2) defines and extends the liability of employers. The ballot title does not contain the slightest suggestion that the measure is designed to protect the public as such. Through its secretary J. F. Cassidy, the Oregon State Federation of Labor filed with the Secretary of

State an argument in support of the measure. This argument was printed in the voters' pamphlet as required by law and sent to every registered voter in the state. The argument is introduced with the following headline: "A Bill for the Protection of Laborers in Hazardous Employments." That the outstanding purpose of the measure was for the protection of workingmen and working-women is made plain and emphatic by the following excerpts taken from the argument:

"Oregon stands backward and almost alone in her failure to recognize that the injury or death of a workman is as much a part of the conduct of the business as the bursting of a boiler or breakage of the machinery and to prevent the death or injury of the workman should be as much a part of the cost of the business as the protection of machinery or replacing old with new. * * This bill does not ask so arbitrary and artificial a thing as that the laborers' wages be protected and guaranteed by law, but it does ask that the employer be compelled to use diligence in protecting the laborer as to his life and limb, while earning wages; that a safe place in which to work be provided and that ropes, chains, beams, machinery, etc., be properly tested before the workman is asked to risk his life with them. Surely this is a reasonable request. Ten per cent of electrical workers are killed. It is a more hazardous employment than war. The same may be said of workers on bridges and high steel frame structures."

The argument printed in the voters' pamphlet concludes with the declaration that the bill

"is not only inherently just in itself and such as no just man or humane man ought to complain of, but it is good policy for Oregon, if she expects to be an attractive home for intelligent workers."

2, 3. We have yet to examine the title of the act; but before doing so it is proper to call attention to Article IV, Section 20, of the state Constitution, which commands that:

"Every act shall embrace but one subject, and matters properly connected therewith which subject shall be expressed in the title.   But if any subject shall be embraced in an act which shall not be expressed in the title, such act shall be void only as to so much thereof as shall not be expressed in the title."

The language of Article IV, Section 20, is "every act" and therefore whether a law be an act passed by the legislative assembly under the authority of Article IV, Section 1, of the state Constitution or whether it be an act adopted by the people in the exercise of the power of the initiative as permitted by the last-mentioned section of the Constitution, it must be entitled in conformity with the requirements of Article IV, Section 20.   Moreover, since every act must have a title expressing the subject matter, the title necessarily becomes a part of the act and offers valuable help in construing the act and determining the legislative intent: *State* v. *Robinson,* 32 Or. 43, 46 (48 Pac. 357).   The scope of the title may possibly be made clearer to the eye if the title is set down in the form of a diagram, accurately preserving, however, not only the wording, but also the punctuation:

A BILL TO PROPOSE BY INITIATIVE PETITION A LAW

1 providing for the protection and safety of persons

2 engaged in the construction, repairing, alteration, or other work,

3 upon buildings, bridges, viaducts, tanks, stacks and other structures,

4 or engaged

5 in any work upon or about

6 electrical wires, or conductors or poles, or supports, or other electrical appliances or contrivances

7 carrying a dangerous current of electricity; or

8 about any machinery or

9 in any dangerous occupation,

10 and extending and defining the liability of employers

11

12 in any or all acts of negligence, or

13 for injury or

14 death of their employees,

15 and defining who are the agents of the employer,

16 and declaring what shall not be a defense in actions by employees against employers,

17 and prescribing a penalty for a violation of the law.

4. The title informs us that the bill provides for the protection and safety of persons ''engaged in'' certain work and that the purpose is to extend the liability of employers to their employees; but the title does not contain the remotest intimation that the body of the bill makes the owner liable in damages to a member of the public who is neither ''engaged in'' any kind of work mentioned in the title nor an employee of certain persons. Measured by the rule announced in *State* v. *Shaw,* 22 Or. 287 (29 Pac. 1028), the title is not broad enough to confer a right of action upon a member of the public as such. It, is true that the opinion in *Clayton* v. *Enterprise Electric Co.,* 82 Or. 149 (161 Pac. 411), contains language more sweeping than was necessary; but that case is to be distinguished from the facts in the instant case, for there, although not an employee of the Enterprise Electric Company, Clayton was nevertheless an employee of Carl Roe, the owner of the motor pump for which the defendant was furnishing electricity, and was engaged in work on and about the electric appliance that caused his death. Turnidge was neither a person engaged in work on or about the wire nor an employee of the owner of the ·wire. When measured by its title the Employers' Liability Act is broad enough, so far as it concerns an electric wire, to include both employees of the owner of the wire and also persons ''engaged in'' certain work as exemplified in *Clayton* v. *Enterprise Electric Co., supra,* but it does not go further and give a right of action to every member of the public. Moreover, aside from any constitutional limitation, it is manifest, for the reasons already pointed out, that it was not the intent of the act to confer a right of action upon every person who might be injured.

The conclusion which we have reached does not necessarily delete the words "the public" found three times in Section 1 of the act. The words "the public" retain their appropriate function in measuring the duty owing to those persons who are entitled to sue and also in determining the criminal liability of the persons enumerated in Section 3 of the act.

If any person is chargeable with negligence on account of the wire breaking from its fastenings there is, of course, a remedy for that negligence. The plaintiff brought this action in her individual capacity as the widow of the decedent; and therefore the judgment of the trial court is not only reversed, but the defendant is granted a judgment of nonsuit.

REVERSED WITH DIRECTIONS.

McBRIDE, C. J., and JOHNS, J., concur, and BEAN, J., concurs in the result.