Argued at Pendleton, October 31, 1922, affirmed February 6, 1923.

## SAYLOR v. ENTERPRISE ELECTRIC COMPANY.

(212 Pac. 477.)

**Electricity—Injury Held not Actionable Under Employers' Liability Act.**

1. An action for the death of one killed by electricity when a hay derrick, which he was moving from one field to another, came in contact with an uninsulated high tension transmission line maintained by the defendant, where the evidence showed that deceased was not an employee of any employer at the time of his death, cannot be maintained under the Employers' Liability Act.

**Master and Servant—Employers' Liability Act Protects Employees Only.**

2. The Employers' Liability Act is designed to protect employees, and to give them or their substitutes, and only to them, the right to prosecute under it an action for damages whenever injury or death results from a violation of it.

From Wallowa: J. W. KNOWLES, Judge.

In Banc.

Carl Saylor was killed by electricity when a hay derrick which he was moving came in contact with an uninsulated high-power transmission line maintained by the defendant, the Enterprise Electric Company, a corporation. Grace M. Saylor, who was his wife at the time of his death, commenced this action in an attempt to recover damages under the provisions of the Employers' Liability Act. The Circuit Court sustained a demurrer to the amended complaint. A judgment in favor of the defendant for its costs and disbursements was entered, and the plaintiff refused to plead further. The plaintiff appealed.

The facts must, of course, be assumed to be as they are related in the amended complaint. On the east and adjoining the town site of Joseph is an irrigated agricultural district known as Upper Prairie Creek Country. Measured from the west to the east the district is four or five miles wide and from north to south it is between five and ten miles long. Upon and over all of the district hay has been raised in large quantities during the last fifteen years. In the work of harvesting the hay the farmers during all of the period mentioned used movable hay derricks and, as "the defendant well knew," it was the custom of the farmers to move their hay derricks from field to field and from farm to farm through gateways and over public roads.

F. D. McCully owned two ranches: One is located within the irrigated district mentioned and is distant about one and one-half miles east of Joseph; the other is north of Joseph, and we infer that it is within the irrigated district. For convenience we shall refer to the ranch which is east of Joseph as the east ranch, and to the other as the north ranch.

A county road extends along the north side of the east ranch. A gateway is located about 200 feet northeast of the dwelling-house on the east ranch. It was necessary for the defendant and his predecessors to make use of the gateway as a place of egress from and ingress to the east ranch.

The defendant maintains a plant at Joseph where it generates electricity; and the electricity is transmitted and sold to farmers living in the irrigated district. The electricity is transmitted in the customary way over wires attached to and suspended from a line of poles. One of the transmission lines is maintained along the county road extending along the north side of the east ranch. This transmission line was suspended over and above the gateway, and at that point the line was not more than 19 feet above the ground. Electricity of "a great and dangerous voltage" was transmitted along the line. The wire was not insulated.

The decedent had been engaged in harvesting on the east ranch and had been using a movable hay derrick of the same kind as other hay derricks generally used in that district. He undertook to transport the derrick from the east ranch to the north ranch where he intended to use it in harvesting hay. When the derrick was being moved through the gateway a wire or steel cable, composing a part of the derrick, came in contact with the transmission line, thus deflecting the electricity from the transmission line to and through the hay derrick and to Carl Saylor, causing his death.

The plaintiff alleges that it was the duty of the defendant either to have suspended the line higher or to have insulated it, and that the defendant could have done either one or the other "without reducing

the effectiveness of the wires in transmitting electricity of a great and dangerous voltage," and that by so doing could have insured "the safety of the life and limb of all persons engaged in work about said line."                                    AFFIRMED.

For appellant there was a brief and oral argument by *Mr. Daniel Boyd.*

For respondent there was a brief and oral argument by *Mr. A. S. Cooley.*

HARRIS, J.—1. The question for discussion is whether the facts bring the instant case within the embrace of the Employers' Liability Act. We are not inquiring whether the defendant was or was not guilty of culpable negligence according to the standards fixed by the rules of common law. If it be assumed for the purposes of discussion that the defendant is chargeable with culpable negligence within the rules of the common law, the plaintiff must nevertheless fail in this action, unless the provisions of the Employers' Liability Act apply to the facts disclosed by the record, because she is suing in her individual capacity. If the Employers' Liability Act applies to the facts, the plaintiff is the person entitled to sue. If the statute does not apply and if the defendant is liable in damages for common law negligence, the representative of the estate of the decedent must sue. If the Employers' Liability Act does not embrace a fact situation like the instant case, the demurrer was properly sustained even though it is assumed that the defendant was guilty of negligence according to common-law standards.

The decedent was not an employee of any employer at the time of his death. He was on a mission of his

own. He was not working for any other person. He was entering upon the county road, a public place, a place where he and the public had a right to be, a place where it was to be expected that the public would be. It is contended that he was engaged in work and that therefore he was a workingman and as such belonged to the class for whose protection the statute was passed. Although it is conceded that he was not working on the wire, it is insisted that he was engaged in work about the wire. The plaintiff does not claim that the act was intended to protect every member of the public, but she does insist ''that it was intended to protect *any member of the public* who might be working 'or engaged in *any* work,' upon or about electric wires carrying a high and dangerous voltage.'' The defendant argues that the statute was designed to cover none but employees.

It will facilitate the discussion if we again relate the history of the Employers' Liability Act and once more copy the statute in full. The act was adopted by the people in the exercise of the power of the initiative. The petition was circulated under the direction of the Oregon State Federation of Labor and was filed with the Secretary of State by J. F. Cassidy, Secretary of the Oregon State Federation of Labor. Upon the authority of Section 5, Chapter 226, Laws of 1907, the Secretary of State transmitted a copy of the measure to the Attorney General with a request that the latter prepare a ballot title, and accordingly the Attorney General did prepare a ballot title. J. F. Cassidy was notified of the form prepared by the Attorney General, and it was apparently satisfactory, for it was printed upon the ballots submitted to the electorate. Through its secretary, J. F. Cassidy, the Oregon State Federation of

Labor filed with the Secretary of State an argument in support of the measure. The ballot title prepared by the Attorney General, the argument submitted by the Oregon State Federation of Labor, and the proposed act were printed in the Voters' Pamphlet as required by law and a copy of that pamphlet was sent to every registered voter in the state. The following is a copy of the ballot title and argument in favor of the measure as they were printed in the Voters' Pamphlet.

"ARGUMENT.

"(Affirmative.)

"Submitted by

"OREGON STATE FEDERATION OF LABOR

in favor of the measure designated on the official ballot as follows:

"PROPOSED BY INITIATIVE PETITION.

"A bill for a law requiring protection for persons engaged in hazardous employments, defining and extending the liability of employers, and providing that contributory negligence shall not be a defense. Vote YES or No.

"330.  Yes.

"331.  No.

"ARGUMENT IN FAVOR OF THE ABOVE MEASURE.

*"A Bill for the Protection of Laborers in Hazardous Employments.*

"This is the call of the plain people to the plain people for relief. Oregon is making a name for itself as the best home for the immigrant because of its political reforms and the powers which the people have taken into their own hands, and yet Oregon stands backward and almost alone in her failure to recognize that the injury or death of a workman is as much a part of the conduct of the business as the bursting of a boiler or breakage of the machinery and to prevent the death or injury of the workman should be as much a part of the cost of the business

as the protection of machinery or replacing old with new. The iron machinery is insured and guarded from injury in every way, but the human machinery is, in fact, too cheap to be worth protecting. Every form of capital receives the aid of special privilege laws; land held in vacancy, money authorized to be issued by certain institutions only; and manufacturers are protected by tariff laws. The only factor in the production of social wealth which is not protected in any sense whatever is labor. Babies are born without limit and must live, and there are always plenty waiting to take the dead man's shoes. This bill does not ask so arbitrary and artificial a thing as that the laborers' wages be protected and guaranteed by law, but it does ask that the employer be compelled to use diligence in protecting the laborer as to his life and limb, while earning wages; that a safe place in which to work be provided and that ropes, chains, beams, machinery, etc., be properly tested before the workman is asked to risk his life with them. Surely this is a reasonable request. Ten per cent of electrical workers are killed. It is a more hazardous employment than war. The same may be said of workers on bridges and high steel frame structures.

"Senator Elihu Root, in his speech before the National Civic Federation, said: 'It seems to me that our present system of dealing with those injuries that come to our employees in our great industrial life is foolish, wasteful, ineffective and barbarous * * . The cost of support which is made necessary by the injuries suffered in a business is just as much a part of the cost of the business as the tools that are worn out and the material that is consumed.'

"The commission appointed to report to the legislature of New York on the question of employers' liability says, at page 11: 'At common law in England and the United States the legal relations of employer and employed before 1837 did not differ in any way from the legal relation of strangers and there were no special rules as to employers' liability. * * Up to

1837 that single principle seems to have been the whole law on the subject. But from that time, both in England and America, there has developed gradually a large body of special law on employers' liability. This is judge-made law * * The important point to be noted is the fact that this body of special laws exists for no very clearly defined reasons of justice or social policy; that it is purely "judge-made" and not over seventy years old.'

"The bill here submitted to the voters of Oregon modifies the prevailing rule as to the defenses of contributory negligence and the negligence of a fellow servant. The ignorance of lawyers is largely responsible for the popular belief that these legal defenses are both holy and hoary and that to weaken them would be to infringe on the sacred rights of employers. As just shown by the quotation above, both these doctrines are judge-made laws, made in England, are of comparatively recent origin, never existed on the continent of Europe, have been abolished by the act of Parliament in England, where they originated; never existed in any system of law except the English; never existed in the admiralty courts of the United States, which takes its law from the Roman law and not from England, so that today in a suit in admiralty it is no defense to allege that the man was damaged by some negligence of his own contributing to the injury. His own negligence may be taken into account in measuring the damages, but is not an absolute bar and this is exactly what this bill proposes. It puts the State courts on the same plane with the courts of admiralty and of all the civilized world in this respect.

"The bill itself is drawn from those of Illinois and Pennsylvania. It is not only inherently just in itself and such as no just man or humane man ought to complain of, but it is good policy for Oregon, if she expects to be an attractive home for intelligent workers. Read the bill.

"OREGON STATE FEDERATION OF LABOR,
"By J. F. CASSIDY, Secretary."

The following is a complete copy of the Employers' Liability Act, with the words ''the public,'' together with other words intimately connected with them, italicized by the writer for the purpose of emphasizing them:

''A bill to propose by initiative petition a law providing for the protection and safety of persons engaged in the construction, repairing, alteration, or other work, upon buildings, bridges, viaducts, tanks, stacks and other structures, or engaged in any work upon or about electrical wires, or conductors or poles, or supports, or other electrical appliances or contrivances carrying a dangerous current of electricity; or about any machinery or in any dangerous occupation, and extending and defining the liability of employers in any or all acts of negligence, or for injury or death of their employees, and defining who are the agents of the employer, and declaring what shall not be a defense in actions by employees against employers, and prescribing a penalty for a violation of the law.

''Be it enacted by the people of the State of Oregon:

''Section 1. All owners, contractors, subcontractors, corporations or persons whatsoever, engaged in the construction, repairing, alteration, removal or painting of any building, bridge, viaduct, or other structure, or in the erection or operation of any machinery, or in the manufacture, transmission and use of electricity, or in the manufacture or use of any dangerous appliances or substance, shall see that all metal, wood, rope, glass, rubber, gutta percha, or other material whatever, shall be carefully selected and inspected and tested so as to detect any defects, and all scaffolding, staging, false work or other temporary structure shall be constructed to bear four times the maximum weight to be sustained by said structure, and such structure shall not at any time be overloaded or overcrowded; and all scaffolding, staging or other structures more than twenty feet from the ground or floor shall be secured from sway-

ing and provided with a strong and efficient safety rail or other contrivance, so as to prevent any person from falling therefrom, and all dangerous machinery shall be securely covered and protected to the fullest extent that the proper operation of the machinery permits, and all shafts, wells, floor openings and similar places of danger shall be inclosed, and all machinery other than that operated by hand power shall, whenever necessary for the safety of persons employed in or about the same, or *for the safety of the general public,* be provided with a system of communication by means of signals, so that at all times there may be prompt and efficient communication between the employees or other persons and the operator of the motive power, and in the transmission and use of electricity of a dangerous voltage full and complete insulation shall be provided *at all points where the public* or the employees of the owner, contractor or subcontractor transmitting or using said electricity are liable to come in contact with the wire, and dead wires shall not be mingled with live wires, nor strung upon the same support, and the arms or supports bearing live wires shall be especially designated by a color or other designation which is instantly apparent and live electrical wires carrying a dangerous voltage shall be strung at such distance from the poles or supports as to permit repairmen to freely engage in their work without danger of shock; and generally, all owners, contractors or subcontractors and other persons having charge of, or responsible for, *any work involving a risk or danger to* the employees or *the public,* shall use every device, care and precaution which it is practicable to use for the protection and safety of life and limb, limited only by the necessity for preserving the efficiency of the structure, machine or other apparatus or device, and without regard to the additional cost of suitable material or safety appliance and devices.

"Section 2. The manager, superintendent, foreman or other person in charge or control of the construction or works or operation, or any part thereof, shall be held to be the agent of the employer in all

suits for damages for death or injury suffered by an employee.

"Section 3. It shall be the duty of owners, contractors, subcontractors, foremen, architects or other persons having charge of the particular work, to see that the requirements of this act are complied with, and for any failure in this respect the person or persons delinquent shall, upon conviction of violating any of the provisions of this act, be fined not less than ten dollars, nor more than one thousand dollars, or imprisoned not less than ten days, nor more than one year, or both, in the discretion of the court, and this shall not affect or lessen the civil liability of such persons as the case may be.

"Section 4. If there shall be any loss of life by reason of the neglect or failures or violations of the provisions of this act by any owner, contractor, or subcontractor, or any person liable under the provisions of this act, the widow of the person so killed, his lineal heirs or adopted children, or the husband, mother, or father, as the case may be, shall have a right of action without any limit as to the amount of damages which may be awarded.

"Section 5. In all actions brought to recover from an employer for injuries suffered by an employee the negligence of a fellow-servant shall not be a defense where the injury was caused or contributed to by any of the following causes, namely: Any defect in the structure, materials, works, plant or machinery of which the employer or his agent could have had knowledge by the exercise of ordinary care; the neglect of any person engaged as superintendent, manager, foreman, or other person in charge or control of the works, plant, machinery or appliances; the incompetence or negligence of any person in charge of, or directing the particular work in which the employee was engaged at the time of the injury or death; the incompetence or negligence of any person to whose orders the employee was bound to conform and did conform and by reason of his having conformed thereto the injury or death resulted; the act of any fellow-servant done in obedience to the rules;

instructions or orders given by the employer or any other person who has authority to direct the doing of said act.

"Section 6. The contributory negligence of the person injured shall not be a defense, but may be taken into account by the jury in fixing the amount of the damage.

"Section 7. All acts or parts of acts inconsistent herewith are hereby repealed."

Language employed by us in *Malloy* v. *Marshall-Wells Hardware Co.*, 90 Or. 303, 351 (173 Pac. 267, 175 Pac. 659, 176 Pac. 589), is peculiarly appropriate, and for that reason we here repeat in substance what was in part said there. The Employers' Liability Act presents itself in two aspects, for it imposes two kinds of liability: The one civil, and the other criminal. Section 3 makes it the duty of owners and other persons having charge of the work to see that the requirements of the statute are complied with, and a failure may be punished by a fine or imprisonment or both without affecting or lessening the civil liability of such persons as the case may be. Viewed in its criminal aspect the statute is obviously intended to make the persons named in Section 3 criminally liable for failure to see that the requirements are complied with, and to this extent, at least, the act has enlarged the liability of certain agents of the employer. It is possible, although it is not necessary to decide, that the civil aspect of the statute in turn presents itself in two phases: One where the statute applies with all its incidents, and one where it does not. The act defines the duties which shall be performed in certain kinds of work, and for convenience we may treat these defined duties as the principal element of the statute, and all else as incidents; and while it may be assumed that the statute imposes

upon certain agents of the owner as well as upon the owner himself the obligation of performing these specified duties, nevertheless it must be remembered that our present inquiry is whether the plaintiff, who is the substituted beneficiary of one who was not an employee, can avail herself of all the incidents which characterize the statute and thus bring the action completely within the Employers' Liability Act. If an action is governed by the Employers' Liability Act, there are certain defenses, including contributory negligence, which cannot be pleaded by the defendant as a bar; but if an action is not governed by this statute, these certain defenses, including contributory negligence, are available as a bar to the action. When we say that an action for damages is completely within the embrace of the Employers' Liability Act we must be understood to mean that the action is one which is properly prosecuted by the person who is injured, or, in case of his death, by his substitute against a proper party defendant who is prohibited from pleading contributory negligence and certain other defenses as a bar. It has been suggested, though it has not been and is not now decided, that there may be persons, as possibly a mere member of the public, who cannot sue an owner under the Employers' Liability Act, because not coming within the complete embrace of the statute, but who nevertheless can sue and allege negligence, and, as was done in *Peterson* v. *Standard Oil Company*, 55 Or. 511 (106 Pac. 337, Ann. Cas. 1912A, 625), prove the alleged negligence by showing the violation of a statute carrying a penalty, and upon such proof of negligence be entitled to recover, unless guilty of contributory negligence. Even though the decedent did not come within the complete embrace of the

106 Or.—28

Employers' Liability Act, it is possible, although we do not decide, that it may nevertheless be true that the representative of the estate of the decedent may sue the defendant for negligence and prove such alleged negligence by showing a failure to perform a duty imposed by the Employers' Liability Act and recover damages, in the absence of contributory negligence, on the theory that the violation of the statute is negligence *per se* under the doctrine announced in *Peterson* v. *Standard Oil Company, supra.* The civil aspect of the Employers' Liability Act may therefore possibly present itself in two phases: One where the statute is available only for the purpose of fixing the extent of the duty of the party sued and none of the incidents of the statute attend an action for damages; and the other, where both the plaintiff and the defendant are completely within the embrace of the statute, so that both the principal element and also the incidents are applicable to an action for a violation. of the enactment.

Again we state, without deciding, that the defendant may be criminally liable for a failure to protect its wires at a point where the public are liable to come in contact with them, without at the same time being liable for damages to a mere member of the public who has been injured by such failure; and again we state, without deciding, that the defendant may possibly be liable for damages to a mere member of the public for negligence, and proof of negligence may be made by showing an omission which the act penalizes by a fine or imprisonment or both. Section 1 of the statute defines the duties of one who maintains transmission lines carrying a high voltage of electricity. If the line is at a point where his employees may come in contact with it, the care re-

quired by the act must be exercised; or if the line is at a point where either his employees or the public may come in contact with it, he must likewise exercise the precaution prescribed by the statute. The act says to the owner: You must use the prescribed care at all points where either your employees or the public are liable to come in contact with your wires. As between the employer and the employee the former must protect the latter not only as to the points where the employee is liable to come in contact with the wires but also at the points where the public are liable to come in contact with them. If an employee is injured or killed at a point where he alone is liable to come in contact with the wire or at a point where the public are liable to come in contact with it, then he or his substitute can recover if his employer failed to do what the statute required of him.

The words "the public" found three times in Section 1 have provoked much discussion and given rise to variant views. Upon different occasions it has been urged that the requirement that the owner shall use every practicable care and precaution when the work involves a danger to the public was intended to enable any member of the public to sue under the act. On the other hand it has been contended that the words "the public" are used only for the purpose of defining the extent of the duty owed by owners to employees; and that in order to compel the performance of that duty not only the owner but certain of his agents may be prosecuted for a crime, and the employee can sue the owner for damages and the latter is deprived of the defense of contributory negligence.

In *Turndige* v. *Thompson*, 89 Or. 637, 175 Pac. 281, we held that a mere member of the public not en-

gaged in work did not come within the embrace of the statute. In *Malloy* v. *Marshall-Wells Hardware Co.*, 90 Or. 303 (173 Pac. 267, 175 Pac. 659, 176 Pac. 589), we held that a foreman may be criminally liable under the Employers' Liability Act, but that the statute with all its incidents did not govern a civil action for damages against him. In *Rorvik* v. *North Pacific Lumber Co.*, 99 Or. 58 (190 Pac. 331, 195 Pac. 163), we ruled that where an employee of one corporation employer is injured or killed by the failure of another corporation employer, although not an employer of the one injured or killed, to use the precaution required by the Employers' Liability Act, the employee or his beneficiary could maintain an action against the culpable employer under the provisions of the Employers' Liability Act. The opinion in *Clayton* v. *Enterprise Electric Co.*, 82 Or. 149 (161 Pac. 411), is authority for the same doctrine; and a statement in *Turnidge* v. *Thompson,* 89 Or. 637, 653 (175 Pac. 281), is an approval of the doctrine. It is not necessary at this time to re-examine the soundness of the doctrine mentioned; for the decedent was not an employee of any employer. And while it may be debatable as to whether or not the decedent can be said to have been engaged in work about the wire within the meaning of the statute, we shall assume, without deciding, that within the meaning of the Employers' Liability Act he was engaged in work about the wire. If, however, the act with all its incidents governs no actions for damages except those brought by employees, then the judgment must be affirmed, even though it is assumed that the decedent was engaged in work about the wire.

When the voters read the argument in the voters' pamphlet they could have received no other impres-

sion than that the bill was designed to protect employees. The context plainly indicates that the words "workmen," and "laborers," and the like, refer to those who work for others. Employers' liability is the theme for discussion. The relation of employer and employee is the relation expressly mentioned. The propriety of enlarging the duties of the employer and the right of the employee is vigorously emphasized. The outstanding thought of the whole argument is the necessity of giving more protection to men and women who work for others and, indeed, it is in this sense that the words "workmen" and "laborers" are used. Those who submitted the affirmative argument are the ones who circulated the petitions necessary for the submission of the act to the electorate, and presumably they are the ones who caused the act to be drawn; and they made it plain that their understanding was that the design of the bill was to protect employees, for it is stated in the argument:

"This bill does not ask so arbitrary and artificial a thing as that the laborers' wages be protected and guaranteed by law, *but it does ask that the employer be compelled to use diligence in protecting the laborer as to his life and limb, while earning wages; that a safe place in which to work be provided* and that ropes, chains, beams, machinery, etc., be properly tested *before the workman is asked to risk his life with them.*"   (Italics ours.)

If the voter read the affirmative argument before he read the bill, it is difficult to understand how he could have entered upon reading the bill with any expectation other than that of reading a bill to protect employees. It is true that the ballot title declares that the bill is "for a law requiring protection for persons engaged in hazardous employments," but it

is also true that it does not say "all persons"; and, moreover, the ballot title does declare that the bill is for a law "defining and extending the liability of employers" thus implying that the persons to be protected are employees.

Attention is now directed to the title and body of the act. Possibly the diagram appearing in *Turnidge* v. *Thompson,* 89 Or. 637, 652 (175 Pac. 281), will be of some aid in the examination of the title, and the diagram in *Camenzind* v. *Freeland Furniture Co.,* 89 Or. 158, 170 (174 Pac. 139), may afford some assistance in the construction of the body of the act.

The title gives the information that the bill proposed a law: (1) Providing for the protection and safety of persons (4) engaged (5) in any work upon or about (6) electrical wires (7) carrying a dangerous current of electricity; or (9) in any dangerous occupation. If the foregoing constituted the whole of the title there might be room for debate as to the extent of the class to be protected; but it does not constitute the whole of the title, and when it is read in connection with the remainder of the title it seems to the writer that it is transparently clear that the object expressed in the title is to protect employees. The title further declares that the bill is for a law (10) extending and defining the liability of employers (15) and defining who are the agents of the employer (16) and declaring what shall not be a defense in actions *by employees* against employers. Section 6 of the body of the act declares that contributory negligence of the person injured shall not be a defense. Any person who examines the statute, be he lawyer or layman, will at once observe that Section 6 is one of the vital elements of the act, and all lawyers will no doubt agree that section is applicable and was intended to be applicable to every

action for damages prosecuted under the act. There is ample room for saying that "actions by employees against employers" means by employees and, in case of death, their substitutes specified in the statute; but there is no room whatever for saying that the word "employees" includes one who, though engaged in work, was not an employee of any person. The title of the act is not by any rule of law or of grammar susceptible of a construction which will be broad enough to prevent an owner of an electric plant from pleading contributory negligence as a defense to an action brought to recover damages for the injury or death of one who was not an employee at the time of the injury.

If the words "general public" found once in Section 1 and the words "the public" appearing twice in the same section had been omitted, it is not at all probable that anyone would have even ventured the suggestion that any person other than an employee might sue and recover under the provisions of the Employers' Liability Act. The word "public" appearing as it does in Section 1 was inserted for the purpose of marking out the extent to which an owner must go for the protection of employees. The purpose was not to give a mere member of the public a right of action. The purpose was to give protection to persons working for others, and in order to give adequate protection to workingmen and workingwomen the statute says to owners of electric plants: Your duty to employees is not fulfilled if you safeguard only the places where employees are liable to come in contact with wires, but in order fully to perform your duty to employees you must go to the extent of safeguarding points with which the public are liable to come in contact.

2. The whole history of the preparation, submission and adoption of the act and the language employed in the title and in the body of the statute make it plain that it is designed to protect employees, and to give to them, or their substitutes, and only to them the right to prosecute under it an action for damages whenever injury or death results from a violation of it.

The judgment is affirmed.